739 So.2d 1046 (1999)
George Ogden CARLEY, Appellant,
v.
STATE of Mississippi, Appellee.
No. 97-KA-00487 COA.
Court of Appeals of Mississippi.
April 20, 1999.
*1047 Anthony J. Buckley, Laurel, Attorney for Appellant.
Office of the Attorney General by Jolene Lowry, Attorney for Appellee.
EN BANC
KING, P.J., for the Court:
¶ 1. This is an appeal of a Jones County Circuit Court conviction on two counts of murder and sentence of two consecutive life terms imposed on the appellant, George Ogden Carley, for the shooting deaths of his parents. Feeling aggrieved by both the convictions and sentences, *1048 Carley has appealed and assigned the following errors:
I. THE TRIAL COURT ERRED IN ADMITTING THE APPELLANT'S INVOLUNTARY CONFESSIONS WHICH WERE THE PRODUCT OF PROMISES OF POLICE COERCION, PROMISES OF REWARD AND LENIENCY, AND RELIGIOUS SALVATION IN VIOLATION OF THE 4th, 5th, 6th, AND 14th AMENDMENTS TO THE U.S. CONSTITUTION AND SECTION 23 AND 26 OF THE MISSISSIPPI CONSTITUTION.
II. THE TRIAL COURT ERRED IN ADMITTING THE APPELLANT'S 2nd AND 3rd CONFESSIONS UNDER THE FRUIT OF THE POISONOUS TREE DOCTRINE.
III. THE TRIAL COURT ERRED FAILING TO DECLARE THAT IT FOLLOWED THE REASONABLE DOUBT STANDARD IN ADMISSION OF THE CONFESSION.
IV. THE TRIAL COURT ERRED IN ALLOWING THE STATE TO AMEND THEIR INDICTMENT BECAUSE THAT AMENDMENT COULD ONLY BE MADE BY A GRAND JURY.
V. THE AMENDED INDICTMENT WAS VOID DUE TO THE OMISSION OF THE WORD "DID".

Relevant Facts
¶ 2. On the morning of March 27, 1995, Joe and Edith Sue Carley were found shot to death in the bedroom of their home. After the Carleys' bodies were discovered, their son, George Ogden Carley, was taken into custody and questioned at the scene. At the time of the shooting, the younger Carley was only fourteen years old and had been diagnosed several months before the shooting as suffering from post traumatic stress disorder. Carley had also been found to have a learning disability in the areas of reading and comprehension. The Carleys adopted George when he was three years old. He was removed from the custody of his biological parents when it was discovered that George and another sibling were being physically and sexually abused.
¶ 3. Officers Morris Walters of the Jones County District Attorney's Office and Freddie Reeves of the Jones County Sheriff's Department began interrogating Carley at 8:50 a.m. and each officer made his separate recordings of the interrogation on Sides A and B of an audiotape. The officers began their individual recordings on Side A of the audiotapes. After an initial denial of involvement in the death of his parents, Carley confessed to the killings. At 9:25 a.m. the investigating officers turned their audiotapes to Side B and recorded Carley's confession. Only the portion of the interrogation contained on Side B was transcribed and provided to Carley's attorneys. Carley's attorneys were informed that no interrogation of Carley had occurred prior to 9:25 a.m.
¶ 4. Once transported from his parents' home, Carley next gave a videotaped confession at 1:25 p.m. and a written confession at 1:43 p.m. at the Jones County Sheriff's Department. Carley's attorneys were not provided a copy or transcription of the videotaped confession.
¶ 5. Carley filed a motion to suppress the 9:25 a.m. audiotaped confession and the 1:43 p.m. written confession given at the sheriff's department. The 9:25 a.m. confession, contained on Side B of the audiotape, suggested that Carley confessed to the murder of his parents without coercion or promise of reward or leniency. The trial court reserved ruling on the motion at the close of the hearing.
¶ 6. There were three separate suppression hearings held to exclude Carley's confessions. The first sought to exclude the 9:25 a.m. audiotaped confession and the 1:43 p.m. written confession. The second sought to exclude the videotaped confession taken at the sheriff's department. The third sought to exclude the 8:50 a.m. confession, contained on the untranscribed *1049 side of the audiotape which was the subject of the first hearing.
¶ 7. During the hearing to suppress the 9:25 a.m. confession, references to earlier conversation not contained on the audiotape led Carley's attorneys to believe that they were not provided with the full text of the confession. To this inquiry, Officer Morris Walters responded that the 8:50 a.m. confession, contained on Side A of the audiotape, "was just so much conversation" and that the confession began at 9:25 a.m. Carley's attorney asked the officer whether a video had been taken of any of Carley's confessions. Officer Walters responded no.
¶ 8. Dr. Diane Little, child and adolescent psychiatrist, testified for the defense during the first suppression hearing. Dr. Little testified that she had been treating Carley for post traumatic stress disorder since February 1994, a little over a year before the murders. Dr. Little explained that in association with the disorder, Carley experienced psychosis, hallucinations, and delusions.
¶ 9. Prior to the fatal shooting of his parents, Carley had been hospitalized on two separate occasions. Carley was hospitalized the first time due to severe depression and psychosis. Carley was prescribed anti-psychotic medications during this hospitalization.[1] Carley was hospitalized the second time on July 21, 1994, because his condition had deteriorated acutely. Carley's parents reported that he had become verbally aggressive at home, which frightened them.
¶ 10. Dr. Little also offered testimony with regard to Carley's learning disability. After hearing the audiotape of the Miranda warnings that Carley was given, Dr. Little was of the opinion that his limited reading and comprehension skills precluded him from understanding what he actually signed.
¶ 11. Following the conclusion of the first suppression hearing, the State informed the trial judge that a videotape had indeed been made of one of the confessions and had since been located by one of the investigating officers.
¶ 12. A second suppression hearing was held to exclude the 1:25 p.m. videotape confession. When asked how he could forget videotaping the most sensational case in Jones County history, Officer Reeves responded that he had handled "several hundred cases since that time." However, of those "several hundred cases," only three or four were murder cases, and Officer Reeves testified that he had not in the year following the Carley double murder videotaped a confession.
¶ 13. At the conclusion of the second suppression hearing, the trial court denied Carley's motion to suppress the 9:25 a.m. confession as well as the 1:25 p.m. videotaped and 1:43 p.m. written confessions given later that same day.
¶ 14. Finally, a third suppression hearing was held based on new revelations concerning the contents of the 8:50 a.m. confession, contained on Side A of the same audiotape which was the subject of the first suppression hearing. The 8:50 a.m. confession revealed more than "just conversation" as it was described during the first suppression hearing by Officer Reeves. Instead, the 8:50 a.m. confession revealed that in an effort to obtain Carley's confession, the officers's held out promises of religious salvation and leniency, and hope of reward.
¶ 15. After reviewing this evidence, the trial court again denied Carley's motion to suppress. After a trial of this matter, Carley was convicted of two counts of murder and sentenced to serve two consecutive life sentences in the custody of the Mississippi Department of Corrections.

*1050 Discussion

THE TRIAL COURT ERRED IN ADMITTING THE APPELLANT'S INVOLUNTARY CONFESSIONS WHICH WERE THE PRODUCT OF PROMISES OF POLICE COERCION, PROMISES OF REWARD AND LENIENCY, AND RELIGIOUS SALVATION IN VIOLATION OF THE 4 th, 5th, 6th, AND 14th AMENDMENTS TO THE U.S. CONSTITUTION AND SECTION 23 AND 26 OF THE MISSISSIPPI CONSTITUTION.
¶ 16. Carley argues that his confessions are not competent as evidence because they were not the product of his own will and should therefore be excluded. Carley alleges that the officers used promises of reward, leniency, and hope of religious salvation to procure his confession. The officers advised Carley that the only way he could go to heaven was to "come forward and tell the truth of his sins." Carley argues that his youthful age, mental illness, and learning disability, coupled with the police officers's promises of religious salvation, leniency, and reward, rendered his confessions involuntary. The privilege against self-incrimination secured by the Fifth and Fourteenth Amendments to the U.S. Constitution and by Article 3, § 26 of the Mississippi Constitution renders an involuntary confession inadmissible. Neal v. State, 451 So.2d 743, 750 (Miss.1984); Morgan v. State, 681 So.2d 82, 87 (Miss.1996). When the voluntariness of a confession is put in issue, the burden falls on the State to prove the voluntariness of the confession beyond a reasonable doubt. Morgan, 681 So.2d at 86; Haymer v. State, 613 So.2d 837, 839 (Miss.1993). The State meets that burden by offering the testimony of those individuals having knowledge of the facts that the confession was given without threats, coercion, or offer of reward. Cox v. State, 586 So.2d 761, 763 (Miss.1991). Exhortations to tell the truth and adhere to religious teachings are the equivalent of inducements which render a statement inadmissable. Abram v. State, 606 So.2d 1015, 1033 (Miss.1992).
¶ 17. A trial judge's role in determining the admissibility of a confession given by the accused is essentially that of fact finder. Alexander v. State, 610 So.2d 320, 326 (Miss.1992). Great deference is afforded such findings because of the judge's unique opportunity to observe the witnesses and assess their credibility. In keeping with this deferential treatment, this Court will not disturb the trial judge's ruling unless it is found to be clearly erroneous or against the overwhelming weight of the evidence. White v. State, 495 So.2d 1346, 1347 (Miss.1986).
¶ 18. "Once the trial judge has determined at a preliminary hearing, that a confession is admissible, the defendant/appellant has a heavy burden in attempting to reverse that decision on appeal." Sills v. State, 634 So.2d 124, 126 (Miss.1994). However, our review of the voluntariness of an accused's confession is less constrained where the trial judge fails to make detailed and specific findings on critical issues. Abram, 606 So.2d at 1031.
¶ 19. There were three separate suppression hearings held to exclude Carley's confessions. The first sought to exclude the 9:25 a.m. audiotaped confession and the 1:43 p.m. written confession. The second sought to exclude the 1:25 p.m. videotaped confession taken at the sheriff's department. The third sought to exclude the 8:50 a.m. confession, contained on the untranscribed side of the audiotape which was the subject of the first hearing.

First Suppression Hearing:
¶ 20. In an attempt to establish the admissibility of the 9:25 a.m. audiotaped confession and the 1:43 p.m. written confession, the State presented the testimony of the officers who participated in interviewing Carley. Testifying at the suppression hearing for the State were Freddie Reeves of the Jones County Sheriff's Department and Morris Walters of the Jones County *1051 District Attorney's Office. The investigating officers, Reeves and Walters, both testified that they did not employ the use of threats, coercion, hope of reward, promise of leniency or other inducement to procure Carley's confession.
¶ 21. The following testimony was developed during Officer Walters's cross-examination:
Q Okay. Now first off I'm going to ask you if you would agree to this statement already begins to be transcribed. [sic] Like you said, it's already started.
A Yes, Sir.
Q It says, "All right. George, you said a while ago you were grounded, right?" So that suggests that you had been questioning him before this transcript.
A That's correct.
Q And you've admitted that we don't have a copy of that transcript between 8:50 and 9:25.
A I have the tape here. I do not have a transcript. I don't know if Mr. Reeves does or not. He might have seen one.
Q Now would you admit that you said in the first line there, "George, I told you the truth is the best policy."
A Correct.
Q So that indicates to me, if I am correct, that prior to this transcript starting, you had a conversation with George for what was best for him, correct? "George, I told you the truth is the best policy."
A Basically, that's what I stated to him, yes, sir.
Q Did you not tell him that the best policy would have been to assert his right to an attorney at this time?
A The truth is the best policy. And that's what I told him.
Q How do you justify telling a fourteen year old at this particular time that truth is the best policy as opposed to not saying anything at all, rather than rather just reading him his rights?
. . .
Q Excuse me. Okay. Now I believe you can answer the question for purposes of the record. Why did you tell him that truth was the best policy at this particular time prior to him giving the statement.
A Because it's been my philosophy my whole life.
. . .
Q Now you also said in the very next sentence, "The Lord says the truthwe all do things we're ashamed of, but we have to answer for them, son. You understand that, don't you?"
You said that to George Carley during this interview; did you not?
A Yes, sir.
Q Do you not admit that you are putting a religious bearing upon that child at that particular time to continue to tell what you're considering the truth?
A I just told him the truth, that we've all got to answer for what we do.
Q But you used the Lord's name in that statement to him, didn't you?
A Probably, yes, sir. If it's there, I did.
Q And you also called him son, didn't you?
A Yes, sir, I did.
. . .
Q You're telling him that we have to answer to the Lord for what we have done; isn't that right?
A Yes, sir.
Q Did you make any previous examinations as to his religious preferences, or his religious understanding of certain things in that regard?
A Well he had said he went to church the night before this all happened, that they had gotten home from *1052 church. So I figured he was doctrinated [sic] in religion somewhere.
¶ 22. The trial judge declined to rule on the admissibility of the confession following the conclusion of the first suppression hearing and stated a preference to review the evidence presented before he rendered a ruling.

Second Suppression Hearing:
¶ 23. Later that same day, a Jones County Assistant District Attorney informed the trial judge that a videotape of the confession which Carley gave at the sheriff's department had been found. On August 13, 1996, during the second suppression hearing, the following line of testimony developed from Officer Reeves:
Q How many times do you make [video]tape recordings of statement's in felony cases? How many times have you done that over the past year? Videotape somebody's statement.
A I haven't made one in the past year since that time. I don't remember one.
Q This is the only videotape you've made in a year and you forgot about it?
. . .
Q Can you think of a more highlighted, publicized case of two people being killed in the last ten years in this county?
A No, sir, I don't.
. . .
Q Is it important to you that you videotaped a statement from this fourteen year old kid in your office? Do you attach an importance to this in this proceeding?
A It's very important.
Q It's very important?
A Yes, sir.
Q In fact, it's the only time that a judge or a jury would have an opportunity to look and actually see what this kid is saying and the reaction of this kid who is claiming that he-or his lawyers are claiming is mentally impaired. They could look at him, and that's the only evidence we've got in this case that they can see, isn't it?
A As far as viewing his statement, yes, sir.
Q And you're telling the Court you forgot you ever had it.
A That's correct.
¶ 24. During this suppression hearing, the trial judge made the following statement on the record:
Well it seems incredible that two police officers that took a ten minute video would not remember taking it. But I didn't see anything in the statement itself once it was presentedI don't see anything in the statement that would show what there was any reason for them to not want to offer the statement, or that there is anything in the statement that would incriminate them as far as what they did, with the exception if there is exception to be noted, that the method of offering someone, especially fourteen years old, the services of an attorney and properly Mirandizing them, it seems to me like it should be done with a little bit more consideration for his rights. I don't know that the answers would have been any different. (emphasis added)
¶ 25. The court went on to rule all statements presented to that point admissible but voiced a concern that the Mississippi Supreme Court would look at the statement "very dimly, if it ever gets there." The trial judge commented further that he was not sure that a such view of Carley's statement's was not appropriate, under the circumstances.

Third Suppression Hearing:
¶ 26. On December 4, 1996, the final suppression hearing was held to exclude the 8:50 a.m. confession, discovered on the untranscribed side of the same audiotape which contained the 9:25 a.m. confession. Carley's attorneys said that the during the *1053 course of the previous hearings, they were alerted that there had been a series of questions and answers by Carley that had not been provided to them. They later discovered that the tape already in their possession on Side A contained objectionable interrogation tactics used by Officers Reeves and Walters. This 8:50 a.m. audiotape contained references to the deity and exhortations for Carley to tell the truth so that he might receive religious salvation.
¶ 27. Carley directs this Court to the following line of testimony given by Officer Reeves which he feels improperly induced his confession and violated his right against self-incrimination as secured by the United States and Mississippi Constitutions:
Q You asked [George] if he thought his mama and daddy were in Heaven, and George said, I believe they are; didn't he?
A Yes, sir.
Q And then you asked George Carley, do you want to go to Heaven; didn't you?
A (No Answer)
Q It's the next sentence, Mr. Reeves.
A No. "Is that where you want to go?" "Yes, sir."
Q Uh-Huh. (Affirmative) And George said, yes, he wanted to go to Heaven, too. And isn't it true that you told George Carley that the only way he could go to Heaven was to tellcome forward and tell the truth of his sins. Is that what you said to the fourteen year old boy?
A Yes, sir.
Q In fact, you told him the only way he could go to Heaven was to give you a confession, wasn't it? That's what you said, wasn't it? It's in black and white.
A I told him the only way he could go to Heaven was is what this thing says, is just to 

The Court:Speak up, please.
A I told him the only way he could go to Heaven is to come forward and tell the truthtell the truth of your sins.
¶ 28. We are particularly troubled by the invocation of the deity, discussion of Heaven and Hell, and the promise that "the truth sets you free" to induce a confession. Considering the evidence of Carley's mental disability, we cannot conclude that his statements were voluntarily made. While the accused's mental weakness may not be the sole reason to exclude a confession, when coupled with overreaching interrogation tactics, it may become the basis for the exclusion of a confession. See Neal, 451 So.2d 743; see also Williamson v. State, 330 So.2d 272, 276 (Miss.1976) ("A confession will not ordinarily be excluded merely because the person making the confession is mentally weak. Until it is shown that a weak-minded person has been overreached to the end that he has divulged that which he would not have divulged had he not been overreached, his voluntary confession is admissible.").
¶ 29. In McGowan v. State, 706 So.2d 231 (Miss.1997), the supreme court held that the totality of the circumstances approach must be used to determine whether even a juvenile has waived his rights and given a confession. The totality of the circumstances approach mandates that the trial judge perform an "evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warning given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." Id. at (¶ 13) (quoting Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)); see also Porter v. State, 616 So.2d 899, 907-08 (Miss.1993)("[T]he applicable standard for determining whether a confession is voluntary is whether, taking into consideration the totality of the circumstances, the statement is the product of the accused's free and rational choice.").
*1054 ¶ 30. In the case sub judice, the trial judge failed to make detailed and specific findings on this most critical issue in determining whether Carley waived his rights. As a result of this failure, this Court is not restrained by the usual "clearly erroneous" standard used in its evaluation of a trial judge's ruling. See Abram, 606 So.2d at 1031. Furthermore, although the trial court itself performed a rather extensive examination of Carley's psychiatrist, Dr. Diane Little, no finding of fact regarding Carley's mental abilities was rendered by the court except to say that it is undisputed that there "is some psychosis there."
¶ 31. The 8:50 a.m. confession is replete with George Carley declaring his innocence in the shooting deaths of his adoptive parents. He proclaimed his love for them and that he was grateful to them for taking him from his biological father who had sexually abused him. That was George Carley's story, and he adhered to it until he was asked about his parents's souls and whether he wanted to see them again. According to Officers Reeves and Walters, Carley could never see his parents again unless he told them the truth. That truth to them was that he killed his parents. There is no evidence that Carley had ever considered elements of religious salvation or hope to see his parents in Heaven prior to the officers's questioning.
¶ 32. Confessions given under the pressure of coercion are deemed unreliable as evidence "because of the `strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will.'" Jackson v. Denno, 378 U.S. 368, 386, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).
¶ 33. This Court can only conclude that the officers's strategy of procuring a confession from Carley was to convince him that he might receive religious salvation for his sins and see his parents again if he told them the truth. This prohibited tactic caused Carley to confess to the commission of a crime that he was resolute in denying involvement. This Court is of the opinion that Carley's will was overborne and that his confession was induced by the investigating officers' invocation of the deity, references to Heaven and Hell, and promises of leniency and religious salvation which, according to the officers' testimony at the suppression hearing, could only be attained by Carley confessing. The tactics used by the police in this case run afoul of all the protections that we all have come to expect as citizens of United States and of this state.
¶ 34. It is important to reiterate here that the State's burden of proof on Carley's motion to suppress was proof beyond a reasonable doubt that his confessions were made of his own free will, without threat or coercion. The trial judge, acting as factfinder, must be satisfied beyond a reasonable doubt that Carley's confessions were of his free will and not the product of threats, coercion, or inducement.
¶ 35. The remarks of the trial judge revealed significant doubt as to the voluntariness of Carley's confessions. This doubt was manifested by the trial judge when he said:
All right. The Court rules that the statement is admissible at this point, based on not the necessarily best [sic] Mirandizing I've seen or observed, but yet we can't hold all officers to the profession [sic] that we would like to think that we exercise in asking those questions. When I ask those questions here before the bench, it's a more critical time, I guess, or maybe not because it's always against self-interest. I go to a further degree of making sure that they understand.
And I would tell Mr. Walters and Mr. Reeves, if it ever comes up again in a case like this, I would look very dimly on the same circumstances where they-if that's their mode of operation, or if that's the way they do it. [sic] There *1055 needs to be more time taken, especially with a fourteen year old.
And I'm not so sure that the Supreme Court won't look at it very dimly, if it ever gets there. I don't know they shouldn't [sic], under the circumstances. But for the purpose of this hearing, the Court will rule the tape and the statements that's been [sic] presented in this motion admissible.
Having expressed a clearly defined and reasonable doubt regarding the admissibility of these confessions, the trial judge should have suppressed them.
¶ 36. Therefore, because we today hold that under the totality of the circumstances, Carley's confessions were inadmissible, this Court reverses and remands this matter to the Jones County Circuit Court for a new trial.
¶ 37. THE JUDGMENT OF THE JONES COUNTY CIRCUIT COURT OF CONVICTION OF TWO COUNTS OF MURDER IS REVERSED AND REMANDED FOR NEW PROCEEDINGS. ALL COSTS OF THIS APPEAL ARE ASSESSED TO JONES COUNTY.
McMILLIN, C.J., SOUTHWICK, P.J., BRIDGES, COLEMAN, DIAZ, PAYNE, AND THOMAS, JJ., CONCUR.
IRVING, J., CONCURS IN RESULT ONLY.
LEE, J., NOT PARTICIPATING.
NOTES
[1] Dr. Little testified that when she visited Carley in jail after the murders he reported that he had not taken his medication for the four days preceding the murders.