911 So.2d 550 (2005)
Robert Lee TYLER, Jr., Appellant
v.
STATE of Mississippi, Appellee.
No. 2003-KA-02009-COA.
Court of Appeals of Mississippi.
March 22, 2005.
Rehearing Denied June 21, 2005.
Certiorari Denied September 22, 2005.
*551 Thomas J. Lowe, Brandon, attorney for appellant.
Office of the Attorney General by John R. Henry, attorney for appellee.
Before LEE, P.J., GRIFFIS and ISHEE, JJ.
*552 LEE, P.J., for the Court.

FACTS AND PROCEDURAL HISTORY
¶ 1. In 2001, Robert Tyler, Jr. lived in Atlanta, Georgia, working as a warehouse supervisor and serving as assistant pastor in an Atlanta church. Unknown to Tyler, a child named Alice Smith[1] had been born to a woman with whom Tyler had a romantic relationship during 1986 and 1987. During 2001, Alice decided to look for her natural father, and she contacted Tyler and requested that he come to Mississippi for a DNA test. After Tyler was confirmed as Alice's father, Alice's mother encouraged Alice to become acquainted with Tyler, and Alice visited Tyler twice during the summer of 2001.
¶ 2. Tyler returned to Mississippi in September of 2001, where he worked at a local store and became a pastor at a local church. Alice visited with Tyler and his family on weekends. Because Alice and her mother lived in a different town from Tyler, Tyler would drive to Alice's home on Sundays to pick her up, returning Alice later that evening.
¶ 3. During the weekend of January 11 through 13, 2002, Alice was visiting with the Tyler family. According to Tyler, he had to finish some work at the store where he was employed, so he took Alice with him. While at the store Alice gave Tyler a note that read: "I'm willing to have sex with my father whenever we get a chance /s/ Alice." Tyler testified that he asked Alice why she wrote the note, and she did not respond. He folded the note and placed it in his pocket, intending to notify Alice's mother. Tyler returned Alice to her home and forgot about the note. On Wednesday of that week, Alice sent Tyler and his family an e-mail, telling them that she hoped to see the family again soon. Some time during that week, Mrs. Tyler found the note, and she confronted Tyler about it. Mrs. Tyler then called Alice's mother to ask why Alice would write such a note.
¶ 4. When Tyler and his family drove to pick up Alice that Friday, Alice and her mother accused Tyler of raping Alice. At this time, Alice was sixteen years old. According to Alice, Tyler forced her to have sex with him three times the night of January 11 while his family slept, once on Saturday morning, three times Saturday night, and on Sunday morning while they were at the store. Alice further testified that she wrote the note after he raped her Sunday morning. She explained that the e-mail she sent was in obedience to Tyler's order that she e-mail him.
¶ 5. On February 8, 2002, Officer Barbario came to Tyler's house, and told him that he had been accused of sexual battery. Tyler voluntarily went to the station for questioning. On March 29, Officers Michael Lee and Lee Hodge sent Alice to the Tyler home with a radio transmitter attached to her clothing. As instructed by the officers, Alice told Tyler that she was pregnant. Alice left after conversing with Tyler for a few minutes, and she and her mother went to the police station. Officer Hodge testified that the transmission of Tyler and Alice's conversation was no good and that the officers could not hear anything on the tape. The officers then went to the Tyler home and asked him to return to the police station.
¶ 6. At the station, Tyler and Alice and Alice's mother were allowed to talk. According to Officers Hodge and Lee, Tyler told Alice that he would take care of the child if the child was indeed his. Tyler denies making statements to this effect.
¶ 7. The officers then took Tyler into an interrogation room, and began to interrogate *553 him. They advised Tyler of his rights, and Tyler stated that he probably would need an attorney. Officer Hodge, who was outside the interrogation room, walked back into the room and asked Tyler if he wanted a lawyer. Tyler responded that he did not, but stated something to the effect that he was "crucifying himself." Tyler then signed a waiver and wrote a statement in which he admitted to having slept with Alice once, and that he did not know that Alice was his daughter until May of 2001.
¶ 8. Tyler's account of the interrogation varies from the officer's testimony. According to Tyler, Lee and Hodge played good cop/bad cop in an effort to get Tyler to sign the waiver. Tyler testified that he continually asked the officers if he needed to get a lawyer, but they never answered. Tyler further testified that when he delayed signing the waiver, Officer Hodge jumped across the table and told Tyler that Hodge would give him thirty-four years in prison. Hodge also stated that he knew the judge, and if Tyler would make a statement he could probably get a more lenient sentence.
¶ 9. Tyler was convicted of sexual battery and sentenced to a term of thirty years without the possibility of parole. It is from this conviction that Tyler appeals, arguing that the trial court erred in the following actions: (1) allowing the State to peremptorily challenge the only black man on the jury panel; (2) not declaring a mistrial when the State asked Tyler if he had ever been accused of anything before; and (3) by admitting Tyler's confession into evidence. Finding no error, we affirm.

DISCUSSION OF ISSUES

I. DID THE TRIAL COURT ERR IN ITS BATSON ASSESSMENT?
¶ 10. Our standard of review requires reversal only if the factual findings of the trial judge are "clearly erroneous or against the overwhelming weight of the evidence." Tanner v. State, 764 So.2d 385(¶ 14) (Miss.2000). Any determination made by a trial judge under Batson is accorded great deference because it is "based, in a large part, on credibility." Coleman v. State, 697 So.2d 777, 785 (Miss.1997). In the Batson context, the term "great deference" has been defined as meaning an insulation from appellate reversal of any trial findings which are not clearly erroneous. Lockett v. State, 517 So.2d 1346, 1349-50 (Miss.1987).
¶ 11. Batson provides procedural directives for the trial court to follow in detecting and disallowing the practice of using peremptory challenges to remove members of an identified racial group from jury service based upon nothing more than their racial identification. Forrest v. State, 876 So.2d 400, 403(¶ 4) (Miss.Ct.App.2003).
First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.
Berry v. State, 728 So.2d 568(¶ 11) (Miss.1999) (citing Hernandez v. New York, 500 U.S. 352, 358-59, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)). Furthermore, "[w]hen the prosecution gives race-neutral reasons for its peremptory strikes, the sufficiency of the defendant's prima facie case becomes moot." Manning v. State, 735 So.2d 323(¶ 28) (Miss.1999). If a defendant offers no rebuttal, the trial court may base its decision solely on the reasons given by the prosecution. Id. at (¶ 29).
*554 ¶ 12. Tyler argues that the trial court erred in striking Juror 52, the only black man on the jury panel. In giving his race-neutral explanation to the court, the prosecutor stated that under the employment section of the juror information sheet, Juror 52 listed no job. The prosecutor explained that "we try to stay away from unemployed jurors." The trial judge responded that the prosecutor did not have a history indicative of striking jurors for racial reasons, and that the prosecutors "do strike unemployed jurors all the time for that reason and that reason alone."
¶ 13. The Mississippi Supreme Court has stated: "[p]ursuant to Batson, this Court has acknowledged that there are [an] infinite number of grounds upon which a prosecutor reasonably may peremptorily strike a juror so long as the prosecutor presents clear and reasonably specific explanations for those reasons.... Among the reasons accepted as race-neutral are ... unemployment [and] employment history".... Berry v. State, 802 So.2d 1033, 1046(¶ 43) (Miss.2001) (emphasis added) (internal citations omitted). Following established Mississippi law, we find that the prosecutor's reason was sufficiently race-neutral, notwithstanding Tyler's arguments that the number of unemployed blacks is disproportionate to the number of unemployed whites. This issue is without merit.

II. DID THE TRIAL COURT ERR IN DENYING TYLER'S MOTION FOR A MISTRIAL?
¶ 14. Tyler next argues that the trial court committed reversible error in denying his motion for a mistrial. While Tyler was testifying, the State asked Tyler, "Have you ever been accused of anything before?" At this point, Tyler's attorney objected and motioned for a mistrial. The prosecutor rephrased the question to "What do you think a natural reaction is if somebody accuses you of something?" Tyler responded "To be in shock." The prosecutor asked another question, and the trial court interrupted, stating that he needed to address Tyler's motion for a mistrial on the record. The trial judge dismissed the jury, and the judge explained why he denied Tyler's motion.
¶ 15. Tyler argues that the court erred because the question prejudiced the jury by attempting to refer to other crimes which Tyler might have committed. Granting a motion for a mistrial is within the sound discretion of the trial judge. Brooks v. State, 788 So.2d 794, 796(¶ 8) (Miss.Ct.App.2001). The trial judge is in the best position to determine the prejudicial effect of a questionable remark. Id. We cannot say that the trial judge abused his discretion in denying the mistrial, for Tyler never answered the question. Furthermore, Tyler did not suffer serious and irreparable damage from the unanswered question. Accordingly, this assignment of error is without merit.

III. DID THE TRIAL COURT ERR IN ADMITTING TYLER'S CONFESSION?
¶ 16. As his last assignment of error, Tyler argues that his confession was involuntary and therefore it was error for the statement to be admitted into evidence. Tyler argues that his confession was involuntary because he asked the officers if he needed an attorney. According to Tyler, the officers never responded to his question. According to the officers, they asked him if he wanted a lawyer, to which he replied in the negative.
¶ 17. The standard of review regarding the admissibility of a confession is as follows: this Court will reverse a trial court's finding that a confession is admissible only when an incorrect legal standard *555 was applied, manifest error was committed, or the decision is contrary to the overwhelming weight of the evidence. Stokes v. State, 797 So.2d 381, 383(¶ 3) (Miss.Ct.App.2001) (citing Duplantis v. State, 644 So.2d 1235 (Miss.1994)).
¶ 18. We look to the case of Holland v. State, 587 So.2d 848 (Miss.1991), for guidance. In Holland, the defendant argued that his confession should have been excluded because his question "Don't you think I need a lawyer?" constituted an unambiguous request for an attorney, and the interrogating officers should have therefore ceased questioning him. After a thorough analysis, the supreme court determined that "Holland's question constituted an ambiguous invocation [of his right to counsel] as a matter of law and as a matter of definition." Id. at 857. The court then determined "whether the police detective responded to Holland's ambiguous invocation within constitutional parameters." Id. The officers reminded Holland of his right to counsel by again advising him of his constitutional right to an attorney; that if he did not want to talk to them he did not have to; and that they wanted to hear his side of the story. Holland responded, "Ok" he would talk to them. Immediately following Holland's decision to waive his rights and "talk to them," the officers again advised Holland of his rightswhich he again waived before confessing. The court found that the officers did not "overreach or wander into unconstitutional territory. They merely clarified Holland's ambiguous question by twice explaining his option to exercise his Miranda rights or to relate his `side of the story.'" Id. at 858.
¶ 19. In the case sub judice, Tyler contends that he repeatedly asked the officers "Am I going to need a lawyer for this?" Officer Lee testified that before Tyler signed waiver, he stated "I'm probably going to need an attorney." Officer Lee then exited the room and told Officer Hodge "I think he's fixing to lawyer up on us," to which Officer Hodge responded by walking back into the room and asking Tyler, "Do you want a lawyer?" To this, Tyler responded, "No, I don't." He then signed the waiver and wrote his statement. Thus, if merely "reminding" a defendant of his right to an attorney is sufficient to clarify an ambiguous request for an attorney as established in Holland, the direct question "Do you want a lawyer?" is clearly constitutionally permissible to clarify Tyler's ambiguous request or questions regarding legal representation.
¶ 20. We must next consider whether Tyler's confession was voluntary. "Findings by a trial court that a confession was voluntary and that the confession is admissible will not be reversed by this Court as long as the trial court applies the correct principles of law and the finding is factually supported by the evidence." Cox v. State, 586 So.2d 761, 763 (Miss.1991). It is the State's burden to prove beyond a reasonable doubt all facts prerequisite to admissibility. Walker v. State, 759 So.2d 422(¶ 6) (Miss.Ct.App.1999). The State meets this burden and establishes a prima facie case by the testimony of an officer, or another person who has knowledge of the facts, that the confession was voluntarily made without any threats, coercion, or offer of reward. Cox, 586 So.2d at 763 (Miss.1991). Furthermore, under Cox, once this burden is met, the defendant must provide evidence or testimony that the statement was not voluntary. Id. at 764.
¶ 21. In the case sub judice, both Officers Lee and Hodge testified that Tyler was not promised anything in exchange for his testimony. Hodge and Lee testified that Tyler signed the waiver and wrote his statement without coercion. Tyler's father *556 testified that he never heard the officers read Tyler his Miranda warnings, but Tyler's signature on the waiver indicates that he read the waiver.[2] Furthermore, when Tyler indicated that he may have interest in an attorney, Officer Hodge directly asked Tyler if he wanted a lawyer, to which Tyler responded, "No I don't." We do not see that the trial court erred in finding that the confession was given voluntarily. At the suppression hearing Tyler failed to rebut the State's prima facie case that the confession was given voluntarily. Accordingly, this assignment of error is without merit.
¶ 22. Finding that Tyler's three assignments of error lack merit, we accordingly affirm the judgment of the trial court.
¶ 23. THE JUDGMENT OF THE DESOTO COUNTY CIRCUIT COURT OF CONVICTION OF SEXUAL BATTERY AND SENTENCE OF THIRTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT POSSIBILITY FOR PAROLE AND MUST REGISTER WITH THE MISSISSIPPI DEPARTMENT OF PUBLIC SAFETY AS A CONVICTED SEX OFFENDER UPON RELEASE, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO DESOTO COUNTY.
KING, C.J., BRIDGES, P.J., MYERS, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY.
NOTES
[1] This Court declines to identify minor victims of sexual assault, therefore the names of the victim and her relatives have been substituted with aliases.
[2] Notably, Tyler does not contend that he was never properly given his Miranda warnings, only that the officers should have ceased interrogating him when he asked if he was going to need a lawyer.