LEE, P.J.,
 

 for the Court:
 

 PROCEDURAL HISTORY
 

 ¶ 1. John Christopher Paul Blakeney was convicted of the murder of Willie Kitchens by a jury in the Circuit Court of Jones County. Blakeney was sentenced to life in the custody of the Mississippi Department of Corrections, and if released before the full sentence is served, he must complete the Eighteenth District Circuit Court’s Community Service Program. Blakeney filed a motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a motion for a new trial, which was denied by the trial court. Blakeney was indicted for the murder of Willie’s wife, Anita, but the jury was deadlocked and a mistrial was declared on this charge.
 

 
 *48
 
 ¶ 2. Blakeney now appeals his conviction and sentence, asserting the following issues: (1) the trial court erred in denying his motion to suppress his confession; (2) the trial court erred in failing to grant his motion for a directed verdict; and (3) the verdict was contrary to the overwhelming weight of the evidence. Finding no merit to these issues, we affirm.
 

 FACTS
 

 ¶ 3. On July 10, 2006, at 4:55 a.m., Trooper Holt Ross of the Mississippi Highway Safety Patrol responded to what was reported as a vehicle accident on Highway 84 East, west of Waynesboro, Mississippi. Trooper Ross arrived at the scene at approximately 5:30 a.m. and discovered a car that had been driven down a slight embankment, through a rusty fence, and had come to rest against a tree. The bodies of Anita and Willie were found in the car. A fire had been started in the backseat of the vehicle, and the windows were covered in smoke. Trooper Ross noticed fireworks in the backseat of the car. The fireworks had been ignited, but Trooper Ross could not find a lighter, matches, or anything else that could have ignited the fireworks. The two occupants of the vehicle were in the driver’s seat and front passenger seat. Both occupants were wearing seatbelts, and the airbags were not deployed. The car’s engine was not running, the gearshift was in neutral, and the car did not show signs of serious impact. A black glove was found in the car, and two containers of gasoline were found in the trunk. Trooper Ross called in the tag number of the vehicle, which showed that Willie was the owner of the vehicle.
 

 ¶ 4. Investigator Matt Ishee of the Jones County Sheriffs Department arrived at the Kitchens’s home at 6:30 a.m. the same morning. Anita and Willie lived in Jones County with their granddaughter, Wanda Blakeney, whom they had adopted as their daughter, and Wanda’s husband, John Christopher Paul Blakeney. Investigator Ishee discovered that the Kitchens’s bed had been stripped and a garbage bag containing items of clothing was on the floor in their bedroom. He also found what he described as confetti, which was actually paper fired from a Taser cartridge. The paper bore the serial number of the cartridge.
 

 ¶ 5. Wanda told law enforcement that her husband, Blakeney, had killed Willie and Anita. Law enforcement located and arrested Blakeney in Louisiana on July 10, 2006. He was detained for questioning in Louisiana until Officer Darrell Perkins, an investigator with the Mississippi Bureau of Investigation, and Deputy James Grimes, an investigator with the Jones County Sheriffs Department, picked him up on July 12 and brought him back to Jones County. Blakeney was interviewed on July 12 and July 13 and confessed that he and his wife, Wanda, killed Willie and Anita. The interviews were recorded on audio and video tape. The first interview lasted approximately three hours, and the second interview lasted approximately two hours.
 

 ¶ 6. Blakeney confessed that Wanda had incurred substantial debt from internet gambling and that she owed Willie and Anita a great deal of money. Blakeney stated that Wanda had gotten into a dispute with Willie and Anita over the money, and this led to Wanda’s idea to murder them. He told the investigators that killing Willie and Anita was Wanda’s idea, but he had helped her carry out the murders. The couple planned the murders on July 4-6, 2006. He admitted that Wanda told him to buy a Taser because Willie had a weak heai’t, and she thought the shock would kill him. Blakeney shot the Taser
 
 *49
 
 at the victims in their bed while they were sleeping. When the Taser did not kill either victim, Blakeney admitted that he suffocated them with a trash bag that was in the room until they were dead. He admitted to dressing the bodies to make it appear they were going to visit a relative, helping to carry the bodies to the car, driving the car while sitting on Willie’s lap, and running the car off the road. He communicated with Wanda, who was driving behind him with their two small children in the car, by walkie talkie. After running the car off the road, he tried to light it on fire with a lighter. He confessed that after the murders, Wanda drove him home, and he drove back to Denham Springs, Louisiana, where he had reserved a hotel room. At some point while Wanda was driving, Blakeney threw his clothes and the Taser out the window.
 

 ¶ 7. A receipt for a Taser was found in Blakeney’s belongings. The receipt showed that the Taser was purchased with cash in Denham Springs on July 7, 2006. Investigators went to the store and confirmed with the clerk that Blakeney had purchased the Taser. Also, video surveillance showed that it was Blakeney who had purchased the Taser. The investigators purchased a Taser that was identical to the one purchased by Blakeney. At trial, the Taser was fired to demonstrate that it ejected confetti which had the serial number of the cartridge on it.
 

 ¶ 8. Another receipt from a Walmart in Baton Rouge, Louisiana showed that later on July 7, Blakeney purchased men’s underwear, women’s beach shoes, men’s socks, men’s black jeans, and a pair of gloves. The underwear was purchased with a debit card, and the remaining items were purchased with cash a minute later. Investigators obtained a surveillance tape that identified Blakeney as the purchaser of the items. The tape was introduced into evidence at trial. Blakeney told officers that he bought the Taser to give to Wanda for protection and that he purchased the black clothing for work.
 

 ¶ 9. A third receipt was found which showed that Blakeney had paid for a room at a Holiday Inn Express in Denham Springs from July 7-10, 2006. Blakeney’s brother, Anthony, testified that he and Blakeney were in Ponchatoula, Louisiana all day on July 9, 2006, until approximately 10:30 p.m. Denham Springs is approximately 285 miles from Jones County.
 

 I. DID THE TRIAL COURT ERR IN DENYING BLAKENEY’S MOTION TO SUPPRESS HIS CONFESSION?
 

 ¶ 10. Blakeney argues that the trial court erred in admitting his confession into evidence because it was involuntary. Blakeney recanted his confession before trial and pleaded not guilty. He argues that before being questioned about the murders, he was held for two days on a suicide watch, and during those two days, he was cold and did not have his prescribed anxiety medication, Paxil and Trazodone. Blakeney also argues that he invoked his right to counsel, but the invocation for assistance of counsel was ignored by law enforcement. Blakeney also argues that his confession was based on offers of leniency by law enforcement.
 

 ¶ 11. “[T]his Court will reverse a trial court’s finding that a confession is admissible only when an incorrect legal standard was applied, manifest error was committed, or the decision is contrary to the overwhelming weight of the evidence.”
 
 Tyler v. State,
 
 911 So.2d 550, 554-55(¶ 17) (Miss.Ct.App.2005) (citing
 
 Stokes v. State,
 
 797 So.2d 381, 383(¶ 3) (Miss.Ct.App.2001)). “Great deference is afforded such findings because of the judge’s unique opportunity to observe the witnesses and assess their credibility.”
 
 Carley v. State,
 
 739 So.2d 1046, 1050(¶ 17)
 
 *50
 
 (Miss.Ct.App.1999). “Once the trial judge has determined at a preliminary hearing, that a confession is admissible, the defendant/appellant has a heavy burden in attempting to reverse that decision on appeal.”
 
 Id.
 
 at (¶ 18) (quoting
 
 Sills v. State,
 
 634 So.2d 124, 126 (Miss.1994)).
 

 ¶ 12. The law regarding the voluntariness of confessions was stated in
 
 Carley,
 
 739 So.2d at 1050(¶ 16), as follows:
 

 The privilege against self-incrimination secured by the Fifth and Fourteenth Amendments to the U.S. Constitution and by Article 3, § 26 of the Mississippi Constitution renders an involuntary confession inadmissible.
 
 Neal v. State,
 
 451 So.2d 743, 750 (Miss.1984);
 
 Morgan v. State,
 
 681 So.2d 82, 87 (Miss.1996). When the voluntariness of a confession is put in issue, the burden falls on the State to prove the voluntariness of the confession beyond a reasonable doubt.
 
 Morgan,
 
 681 So.2d at 86;
 
 Haymer v. State,
 
 613 So.2d 837, 839 (Miss.1993). The State meets that burden by offering the testimony of those individuals having knowledge of the facts that the confession was given without threats, coercion, or offer of reward.
 
 Cox v. State,
 
 586 So.2d 761, 763 (Miss.1991).
 

 1. Was Blakeney denied the right to an attorney?
 

 ¶ 13. Blakeney was interrogated twice and informed each time by law enforcement of the right to counsel and the right to remain silent pursuant to
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He was also read his
 
 Miranda
 
 rights when he was picked up in Louisiana. Blakeney agreed to talk to law enforcement and signed a waiver of rights. The following exchange took place between Blakeney and Officer Perkins at the beginning of Blakeney’s first interview on July 12:
 

 [Perkins]: This is a waiver. I am going to read it to you and you can read it as well. I have read the statement of my rights and understand what my rights are and am willing to answer questions and make a statement. I do not want a lawyer at this time. I understand and know what I am doing. No promises, threats have been make [sic] to me and no pressure or cohersion of any kind has been made against me. Is that true?
 

 [Blakeney]: So far.
 

 [Perkins]: Ok. Do you wish to talk to me about what’s going on?
 

 [Blakeney]: I need to talk to somebody[.] I don’t know if I need a lawyer or not.
 

 [Perkins]: I can’t advise you if you need a lawyer or not.
 

 [Blakeney]: I don’t.
 

 [Perkins]: We can talk about it or we can call and have a lawyer ... but I cannot tell you which way to go.
 

 [Blakeney]: Do I have a right to stop talking?
 

 [Perkins]: You sure do. If you get to a certain point and you say you don’t want to talk to me any more [sic] and you want a lawyer then the interview at that time is terminated. Do you wish to talk to me?
 

 [Blakeney]: We’ll talk.
 

 ¶ 14. At the suppression hearing, Blakeney testified that he requested an attorney before the interview started, but he was told by Officer Perkins that he was not entitled to an attorney until after he was indicted. Blakeney also argues that the investigators repeatedly discouraged him from requesting an attorney by making statements such as, “I’ll be here with ya, ... I ain’t gonna let nothing happen to ya,” and “if you need somebody to lean on I’ll be there.” The State called Officer Perkins, Deputy Ishee, and Deputy
 
 *51
 
 Grimes to testify at the suppression hearing. All three testified that Blakeney showed no sign of intoxication or inability to understand his rights when he was in them custody. Officer Perkins testified that he made no threats or promises to Blakeney. He also testified that he did not tell Blakeney that he could not have an attorney before he was indicted. Officer Perkins admitted to telling Blakeney that he would not let anything happen to him, but he testified that he meant he would not let Blakeney be physically harmed.
 

 ¶ 15. After reviewing the testimony from the suppression hearing, we find that Blakeney’s statements — “I need to talk to somebody.”; “I don’t know if I need a lawyer or not.”; and “Do I have the right to stop talking?” — were at best ambiguous requests for an attorney. We also find that the investigators did not overstep constitutional parameters in following up on these statements with further questions regarding this statement. In
 
 Holland v. State,
 
 587 So.2d 848, 856 (Miss.1991), the supreme court determined that the defendant’s question — “Don’t you think I need a lawyer?” — was an ambiguous invocation of his right to counsel and the police detective’s follow-up questions were within constitutional parameters. The officers reminded the defendant of his right to counsel and that if he did not want to talk to them he did not have to continue with the interview.
 
 Id.
 
 at 858. The defendant responded, “Ok,” that “he would talk to them.”
 
 Id.
 
 The officers again advised the defendant of his rights, which he again waived before confessing.
 
 Id.
 
 at 854.
 

 ¶ 16. When Blakeney made the statement, “I don’t know if I need an attorney or not,” Officer Perkins reminded him that he could ask for an attorney and the interview would be terminated. Blakeney responded, “We’ll talk.” The investigators repeatedly told Blakeney throughout both interviews that he could stop talking and call an attorney. The investigators also told Blakeney several times that they could not advise him whether or not he needed an attorney. As for Blakeney’s assertion that Officer Perkins told him he could not have an attorney until after he was indicted, we find that even if taken as true, this was clarified at the beginning of the first interview when Blakeney signed the waiver of rights. Therefore, we find that the trial court did not err in finding that Blakeney did not invoke his right to counsel. This issue is without merit.
 

 2. Was Blakeney’s confession coerced?
 

 ¶ 17. Blakeney testified that he was told by sheriffs deputies that they had him “red handed” and that he would get the death penalty. Blakeney argues that the investigators used deceptive practices and implied that he was totally dependent on them for any assistance. Blakeney argues that they used his love for his wife against him by telling him that his wife had confessed and blamed everything on him.
 

 ¶ 18. Regarding a possible death-penalty sentence, Officer Perkins told Blakeney:
 

 There’s two counts of charges of murder on Wanda and they’re gonna upgrade them to Capital Murder. And there’s two charges of counts of murder on Chris Blakeney and they are going to upgrade them to Capital Murder. Capital Murder is bad. You can sit on death row for years. Or you can have two consecutive life sentences. Or if the DA feels it [he] can reduce it or jack it up. What ever [sic][he] want[s] to do.
 

 The investigators also told Blakeney that it was in his best interest to talk and that if they could show the judge that Blakeney was willing to talk to them it would help him out. The investigators also offered
 
 *52
 
 him smokeless tobacco when he asked for it, which Blakeney argues was a ploy to make him confess.
 

 ¶ 19. Officer Perkins, Deputy Grimes, and Deputy Ishee testified at the suppression hearing that they did not threaten Blakeney or make any promise of leniency. When the investigators asked Blakeney during his second interview whether he was coerced or manipulated into confessing, Blakeney responded, “no, other than scaling the hell out of me, no.” Blakeney then compared his position to how his deck hands must feel when he, as boat captain, is in front of them. At the suppression hearing, Blakeney testified that he stated he was coerced and manipulated into confessing because he was intimidated by the officers and that he would not have confessed otherwise. Blakeney also argues that he was refused medical care. Blake-ney asked, “Do they let doctors come visit people?” The investigator’s response was that Blakeney would have to talk to an attorney about that, but that it might create a “difficult situation” if Blakeney wanted to continue talking to law enforcement.
 

 ¶ 20. Giving deference to the trial court’s ruling at the suppression hearing, we find that the trial court did not err in denying Blakeney’s motion to suppress his confession. We find that the proof established beyond a reasonable doubt that: Blakeney was given his
 
 Miranda
 
 rights; he understood his rights; he freely signed a waiver of his rights; and he freely, voluntarily, knowingly, and intelligently waived his constitutional rights without any threats, promises, or coercion by the investigators. Therefore, we find that this issue is without merit.
 

 II. DID THE TRIAL COURT ERR IN DENYING BLAKENEY’S MOTION FOR A DIRECTED VERDICT OR, IN THE ALTERNATIVE, A NEW TRIAL?
 

 ¶ 21. Blakeney argues that his conviction was based solely on his confession, which was uncorroborated. Thus, he argues that his conviction should be reversed and rendered or, in the alternative, a new trial should be granted.
 

 ¶ 22. In reviewing the denial of a motion for a directed verdict, “all of the evidence on behalf of the [S]tate must be taken as true, together with any reasonable inferences, and, if there is sufficient evidence to support a verdict of guilty, the motion for a directed verdict must be overruled.”
 
 Gibson v. State,
 
 503 So.2d
 
 230, 232
 
 (Miss.1987). Our standard of review concerning the granting of a new trial is well settled. “[W]e will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.”
 
 Bush v. State,
 
 895 So.2d 836, 844(¶ 18) (Miss.2005) (citing
 
 Herring v. State, 691
 
 So.2d 948, 957 (Miss.1997)). The appellate court sits as a hypothetical “thirteenth juror.”
 
 Id.
 
 If, in this position, the Court disagrees with the verdict of the jury, “the proper remedy is to grant a new trial.”
 
 Id.
 

 ¶ 23. Murder is defined as “[t]he killing of a human being without the authority of law by any means or in any manner ... [w]hen done with deliberate design to effect the death of the person killed, or of any human being....” Miss.Code Ann. § 97-3-19(l)(a) (Rev.2006).
 

 ¶ 24. Blakeney argues that without his confession, the State had no evidence to show that he committed either murder. He argued that he was not in Jones County at the time of the murders. Blakeney’s brother, Anthony, testified that Blakeney was in Denham Springs, Louisiana, which is approximately 285 miles from Jones County, Mississippi, on the night before the murder. However, Anthony could not
 
 *53
 
 testify as to Blakeney’s whereabouts after 10:30 p.m. Telephone records indicated that his phone registered on a tower in Denham Springs at 2:07 a.m. and 7:40 a.m. The call received at 2:07 a.m. lasted for approximately one hour. The State offered testimony that Blakeney’s cell phone had an automatic answering feature that would allow the phone to answer itself when a call was made to it. The call made on Blakeney’s cell phone at 7:40 a.m. was to his brother.
 

 ¶ 25. It was undisputed that Blakeney purchased a Taser four days before the murders. An identical Taser was fired at trial, and the jury was shown that the serial number on the type of Taser that Blakeney purchased matched the serial number on the confetti shot out of the Taser fired in the Kitchens’s bedroom. Blakeney argued that he was not the one who shot the Taser, but that he had given it to his wife for protection.
 

 ¶ 26. Blakeney also presented evidence that DNA testing was done on hair follicles found under the fingernails of the victims, and that the follicles did not belong to Blakeney. The State, however, argued that the hair follicles could have belonged to Wanda or that they could have been unrelated to the murder.
 

 ¶ 27. We find that Blakeney’s arguments presented a factual dispute for the jury to resolve. As we have consistently held, the jury is charged with the responsibility of resolving factual disputes.
 
 Brown v. State,
 
 934 So.2d 1039, 1044(¶ 18) (Miss.Ct.App.2006). Furthermore, we cannot find that the jury’s verdict was so contrary to the overwhelming weight of the evidence as to amount to an unconscionable injustice. Also, taking the evidence in the light most favorable to the State, we find that the trial court did not err in denying Blakeney’s motion for a directed verdict. Therefore, we find this issue to be without merit.
 

 ¶ 28. THE JUDGMENT OF THE JONES COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO JONES COUNTY.
 

 KING, C.J., MYERS, P.J, IRVING, GRIFFIS, BARNES, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR. ISHEE,J., NOT PARTICIPATING.