No. 67,861

State of Kansas, *Appellee*, v. Clifford D. Steadman, *Appellant*.

(855 P.2d 919)

Opinion filed July 9, 1993.

*Thomas Jacquinot*, special appellate defender, argued the cause, and *B. Kay Huff*, special appellate defender, and *Jessica R. Kunen*, chief appellate defender, were on the brief for appellant.

*Libbie A. Moore*, county attorney, argued the cause, and *Robert T. Stephan*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant Clifford D. Steadman appeals his convictions of second-degree murder and robbery, claiming the district court (1) erred in allowing police officers who were not expert witnesses to testify that in their opinion the defendant was guilty and others investigated were not guilty of the crime; (2) admitted gruesome evidence that had no probative value and was highly prejudicial; (3) allowed the jury to be informed that the defendant had claimed his Fifth Amendment right when questioned by law enforcement officers; and (4) erred in refusing to instruct on lesser included offenses.

Steadman was convicted of the second-degree murder and robbery of William Earle Haislip. Steadman was an acquaintance of Haislip. Haislip, who was 74 years of age, was beaten and strangled on or about September 18, 1990, the day his body was found in his trailer home in Great Bend, Kansas.

Steadman had been working as a confidential informant for the police after the police had found marijuana, drug paraphernalia, and some cocaine in his house. Steadman had been wired with a transmitter and made several buys for Detective Whistler from September 8 through September 17, 1990.

At approximately 9:15 p.m. on September 18, 1990, Steadman knocked on the door of Ambra Chism, a neighbor of Haislip, and asked if she had seen Haislip that day. Chism did not recall seeing Haislip. Steadman told her he had not seen Haislip all day and was worried about him, although at trial, Steadman testified he had been in Haislip's trailer earlier that day and found Haislip, became frightened, and left. Chism and her son, James Johnson, and Steadman went to Haislip's trailer to check on him.

When no one answered her knock at the trailer, Chism stepped just inside the door. Chism thought she saw something in the

living room, walked in, and saw Haislip lying on the floor with some kind of blue fabric covering the upper part of his body. There was blood on the fabric. Chism became frightened and exited the residence. Steadman and Johnson had remained outside. The three returned to Chism's residence. Chism telephoned 911 for help. An ambulance and police arrived about 10 minutes later.

A pillow covered the head and part of Haislip's upper body. A plastic-covered cable and stereo speaker wire were wrapped tightly around his neck several times. More stereo speaker wire lay underneath the body, along with a bloodstained matchbook. (A fingerprint in blood on the matchbook was later identified as matching Steadman's left thumbprint.) There were lacerations on Haislip's head. One of Haislip's trouser pockets had been turned inside out and there was loose change on the floor.

Later, Steadman called Detective Whistler's residence and left a message for Whistler to call him. When the officer returned his call, Steadman advised him that Haislip kept a blue bank bag on the table and carried a wallet. Neither the wallet nor the bank bag was ever found. He also said that Haislip had offered him a check for $300 on September 17. After he refused to accept the check, Haislip tore up the check. Whistler went to the trailer and looked for a check but did not find the check or the pieces, and Haislip's check registry did not indicate a check was missing or unrecorded. Throughout the investigation, Steadman maintained his story about the check.

Police eventually found that Haislip had erred and recorded his checks as being one number higher than the number of the check he had actually written. One check was unaccounted for. Steadman suggested to Detective Whistler that he perform an indentation test. The KBI did an indentation test on the check register and undertook a handwriting analysis. The expert concluded that Haislip had written a check to Steadman for $300, and found no indication that Steadman had forged the check.

On September 19, 1990, stereo wire similar to that found in Haislip's trailer was found in the street directly in front of Steadman's driveway. A search warrant was obtained, and Steadman's residence was searched that evening. A similar stereo speaker wire was found. On October 1, 1990, Steadman's residence was

searched a second time. During that search, more speaker wire resembling the wire around Haislip's neck was found.

On October 1, 1990, during an interview with Steadman, Detective Whistler told Steadman that one of his fingerprints had been found near the body and that the print was in blood. Shortly after that, Steadman said he wanted to call his attorney. Whistler ended the interview and placed Steadman under arrest for the murder of Haislip.

Steadman was charged with felony murder and premeditated murder in the alternative, and with aggravated robbery. He was convicted of second-degree murder and robbery and now appeals his convictions.

Steadman claims first the trial court erred in permitting witnesses to state that in their opinion the defendant was guilty. Detective Whistler testified it was his opinion that Steadman killed Haislip and that only guilty suspects feel the enormous pressure Steadman felt during interrogation. Detective Bailey testified he thought Steadman was guilty because other suspects were "honest" and that police lacked probable cause to arrest anyone other than Steadman and there was sufficient probable cause to obtain a search warrant.

With regard to defendant's contention that the trial court erred in allowing Detective Whistler to state in his opinion that Steadman killed Haislip, the trial transcript reflects:

"Q. (By [county attorney] Ms. Moore) Sir, who first requested the indentation test on the check?

A. Mr. Steadman.

Q. In your opinion, sir, is there any way the defendant could be as adamant as he was about the indentation showing that that was the last check written?

A. In my opinion he killed Mr. Haislip and he knew that that was the check that was written and that would be the only way that he would know that that was—

MS. KITTS [defense attorney]: Your Honor, I object to that.

A. —that that was there, the indentation was there.

THE COURT: What's your objection?

MS. KITTS: Your Honor, he, it has not been proven that Mr. Steadman has killed Mr. Haislip, we're here to determine that.

THE COURT: That's exactly true, and all he did was give his opinion as to why, and he's entitled to do that. If you want to recross examine, you have that opportunity.

MS. KITTS: Thank you, Your Honor.
Q. (Ms. Moore) Could he have been certain any other way?
A. Not in my opinion, no."

Whistler's opinion testimony that only guilty suspects feel the enormous pressure Steadman felt occurred as follows:

"Q. [Ms. Moore] Detective Whistler, Ms. Kitts inquired of you whether people who are interviewed at the Police Department ever feel some pressure and, in this particular case could the defendant have possibly felt enormous pressure. In your experience do innocent people feel as much pressure as guilty ones?
A. Yes, they do, anytime people have contact with the Police Department most of the time it creates some anxiety with them.
Q. But can you compare the pressure level of an innocent person to a guilty person?
   MS. KITTS: Objection, Your Honor, that's obviously a speculation that we can't expect of Detective Whistler.
   THE COURT: Well, he can give his opinion. Overruled.
   MS. KITTS: The level of, is that what you said, the level of pressure.
   MS. MOORE: Yes, based on your question on cross.
A. I believe the level of pressure is higher on a guilty person than it would be on an innocent person.
Q. Enormous, possibly?
A. Enormous possibly."

As to defendant's guilt because the police had probable cause to obtain a search warrant for the defendant's residence, but lacked probable cause to arrest other individuals interviewed in connection with the death. Detective Bailey testified as follows:

"Q. [By county attorney] Sir, have you received training and have experience in what is entailed in requesting search warrants?
A. Yes.
Q. And would you describe what level of proof is necessary to obtain a search warrant?
A. It would be the affidavit would contain facts showing, you know, the purpose of why, what leads you to believe certain items or fruits of a crime would be at a specific location.
Q. Is that described as probable cause?
A. Yes.
Q. Sir, at this point in the investigation obviously there was probable cause for a search warrant to issue for the defendant's home, is that correct?
A. Yes, there was.
Q. At this point in the investigation, sir, was there any probable cause for a search warrant to issue of Doug Chism's home?
A. No, there was not.

Q. At any time was there sufficient probable cause for a search warrant to be issued for the home of Doug Chism?
A. No.
Q. Sir, your interviews with Doug Chism took place over a series of time, is that correct?
A. Yes, they had.
Q. You had several interviews with Mr. Chism?
A. Yes.
Q. During that time, sir, did his statements change in any significant way?
A. No.
Q. They were consistent over that period of time?
A. Yes.
Q. And that's a period of at least several months, is that true?
A. Yes.
Q. Unlike the defendant's statements?
A. True.
Q. Which changed significantly over time, is that correct?
A. Yes.
Q. Sir, did your investigation of Earle Haislip's murder stop when the defendant was arrested and placed in jail?
A. No.
Q. It was a continuing one, was it not?
A. Yes, it was.
Q. Would it be safe to say that it still continues if evidence turned up at this point?
A. Yes, ma'am.
Q. And has any evidence ever turned up which would cause you to believe you have probable cause for a search warrant of Doug Chism's home at this time?
A. None yet.
Q. Is there any evidence which would lead you to believe that Doug Chism was involved in the murder of Earle Haislip?
A. No."

Errors which do not affirmatively appear to have prejudicially affected the substantial rights of the party complaining do not require reversal when substantial justice has been done. *State v. Bell*, 239 Kan. 229, 235, 718 P.2d 628 (1986). Did these errors prejudicially affect the defendant's right to a fair trial?

Steadman cites a 9th Circuit case, *U.S. v. Kinsey*, 843 F.2d 383 (9th Cir. 1988), in which the court observed that "[a] witness, however, may not give a direct opinion on the defendant's guilt or innocence" and then cited two earlier cases. 843 F.2d at 388. The court in *Kinsey*, though, did not decide that particular issue. The *Kinsey* court noted that *United States v. Fleishman*, 684 F.2d

1329 (9th Cir.), *cert. denied* 459 U.S. 1044 (1982), and *United States v. Windfelder*, 790 F.2d 576, 582 (7th Cir. 1986), distinguished testimony regarding defendant's guilt or innocence from expert testimony regarding various roles which an individual may play in an illegal enterprise, *i.e.*, acting as a lookout, attempting to avoid surveillance, or attempting to understate income tax. In considering the testimony of a detective to the effect that the defendant was involved in the distribution of cocaine, the court held that the probative value of the testimony "strongly outweighs any prejudice which the admission thereof would have as an opinion on an ultimate issue. An ultimate issue opinion by a properly qualified expert should not be excluded except in the extreme case where the expert's opinion is inherently misleading or unfairly prejudicial." 843 F.2d at 389.

K.S.A. 60-456 provides:

"(a) If the witness is not testifying as an expert his or her testimony in the form of opinions or inferences is limited to such opinions or inferences as the judge finds (a) may be rationally based on the perception of the witness and (b) are helpful to a clearer understanding of his or her testimony.

"(b) If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness.

"(c) Unless the judge excludes the testimony he or she shall be deemed to have made the finding requisite to its admission.

"(d) Testimony in the form of opinions or inferences otherwise admissible under this article is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of the fact."

The State concedes that Detectives Whistler and Bailey had not qualified as expert witnesses when testifying that in their opinion the defendant was guilty of the crime and exhibited the pressure felt by a guilty person, other persons interviewed were not guilty of the crime, and there was sufficient probable cause for the issuance of a search warrant for the defendant's residence.

In *State v. Bressman*, 236 Kan. 296, 689 P.2d 901 (1984), the defendant was convicted of rape and aggravated sodomy. At the trial, the court permitted the State's medical expert, a physician who examined the alleged victim at Bethany Medical Center in Kansas City following the incident, to testify before the jury that

in her opinion the victim had been raped. It was the position of defense counsel in *Bressman* that the trial court erred in admitting expert testimony because it was without sufficient foundation and invaded the province of the jury. The State argued that the testimony was admissible under K.S.A. 60-456. The court in *Bressman* rejected the State's argument, relying on *Lollis v. Superior Sales Co.*, 224 Kan. 251, 580 P.2d 423 (1978), where it was held that, under K.S.A. 60-456, the opinion testimony of experts on the ultimate issue or issues is not admissible without limitations. Such testimony is admissible only insofar as the opinion will aid the jury in the interpretation of technical facts or when it will assist the jury in understanding the material in evidence. The basis for the admission of expert testimony is necessity, arising out of the particular circumstances of the case. Where the normal experience and qualifications of lay jurors permit them to draw proper conclusions from given facts and circumstances, expert conclusions or opinions are inadmissible. *State v. Lash*, 237 Kan. 384, 699 P.2d 49 (1985).

In a criminal trial, the defendant has the right to have the jury determine from the evidence whether the defendant is guilty or not. The police witnesses can testify from their experience as to a role the defendant played in an illegal enterprise—they cannot testify that in their opinion the defendant was guilty of the crime. The admission of witnesses' testimony that in their opinion the defendant was guilty of the crime and exhibited the pressure felt by a guilty person, other persons interviewed were not guilty of the crime, and there was sufficient probable cause for the issuance of a search warrant for the defendant's residence deprived the defendant of his right to a fair trial. We therefore reverse defendant's conviction and remand this case to the district court for a new trial.

Steadman next contends the trial court admitted gruesome evidence, the skullcap of the victim, that had no probative value and was highly prejudicial. The skullcap was the top portion of Haislip's skull which the Barton County Coroner, Dr. Edward L. Jones, M.D., sawed off during the autopsy on September 19, 1990. The bone was cleaned and preserved. The coroner had detected an irregularity of the skull bone which had resulted from

an attack of some kind, removed that portion of the skull, and requested some extra x-ray studies of the bone.

During an in camera hearing to determine whether to admit the skullcap into evidence, the prosecutor asked the coroner whether he thought the blow (the irregularity) to the skull was significant. Defense counsel objected, stating that the doctor was not a lawyer so "he cannot determine that for evidentiary purposes this is significant." The trial court ruled that the doctor could express his opinion as a doctor whether it was significant. The coroner stated that it was significant because it was a uniquely shaped wound and the skull might assist the officers in matching a weapon to the wound.

The State requested that the skullcap be admitted to show the jury the force used to inflict that particular wound. In addition, the coroner testified that the blow might have rendered Haislip somewhat "woozy" or perhaps unconscious for a few seconds to a minute.

Defendant argues that the skullcap should not have been admitted as it had no relevance because it was not used (1) by experts for identification, (2) to corroborate the testimony of other witnesses, or (3) to show the violent manner of death. Defendant is correct as to (1) and (2). However, defendant is incorrect as to (3). The skullcap could be used to show the violent nature of Haislip's death because, although the blow to Haislip's head was not fatal, the coroner testified it may have left Haislip "woozy." Defendant raises additional arguments that the skullcap was not visible at the crime scene and that the skullcap was cumulative to the photographs of the injury but more grisly. Defendant fails to explain either of these arguments or provide citations to the record in support of these claims.

The admissibility of physical evidence lies within the sound discretion of the trial court and is to be determined on the basis of its relevance in connection with the accused and the crime charged. *State v. Nicholson*, 225 Kan. 418, 419-20, 590 P.2d 1069 (1979). Relevant evidence is evidence having any tendency in reason to prove any material fact. K.S.A. 60-401(b). The determination of relevancy is a matter of logic and experience, not a matter of law. Furthermore, when a physical object is offered into evidence and a question arises as to its connection with either

the defendant or the crime charged, unless it is clearly irrelevant, the object should be admitted for such weight and effect as the jury sees fit to give it. *Nicholson*, 225 Kan. at 420. *State v. Ji*, 251 Kan. 3, 832 P.2d 1176 (1992). Relevancy and materiality are matters within the sound discretion of the trial court. We will not disturb an evidentiary ruling unless there is a clear showing of abuse of discretion. *State v. Abu-Isba*, 235 Kan. 851, 857-58, 685 P.2d 856 (1984). See *State v. Cooper*, 252 Kan. 340, 349, 845 P.2d 631 (1993).

The trial court may exclude gruesome photographs and other evidence which are unduly prejudicial and which are offered solely to prejudice the mind of the jury. Evidence need not be excluded, however, merely because it portrays a gruesome crime. Such evidence offered to prove the elements of the crime, the fact and manner of death, and the violent nature of the death and to corroborate the testimony of other witnesses is relevant and admissible. *State v. Hollis*, 240 Kan. 521, 731 P.2d 260 (1987).

The skullcap was relevant. It demonstrated the violent nature of Haislip's death. The defendant has failed to show any abuse of discretion.

Defendant next contends that there was reversible trial error when Detective Whistler testified that the defendant, after receiving *Miranda* warnings, had consulted a lawyer, invoked his Fifth Amendment rights, and remained silent when confronted with the evidence of a fingerprint.

These errors were not objected to at trial. When constitutional grounds are asserted for the first time on appeal, they are not properly before the appellate court for review. *State v. Goss*, 245 Kan. 189, 193, 777 P.2d 781 (1989). The defendant cannot raise these points on appeal because they were not presented to the trial court. *State v. Crawford*, 246 Kan. 231, 234, 787 P.2d 1180 (1990).

Finally, defendant contends error in the jury instructions. As we are remanding this case for a new trial, any instructions will be based on the charges and evidence presented at that trial. Further discussion in that regard is unnecessary.

Reversed and remanded for a new trial.