No. 91,466

STATE OF KANSAS, *Appellee*, v. DARRELL L. FARMER, *Appellant*.

(175 P.3d 221)

Opinion filed February 1, 2008.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Linda E. DeWitt*, special counsel, of Larry Markle Law Offices, of Coffeyville, argued the cause, and *F. William Cullins*, county attorney, and *Phill Kline*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, C.J.: Darrell L. Farmer appeals his convictions and sentences for first-degree felony murder, criminal discharge of a firearm at an occupied vehicle, aggravated burglary, aggravated battery, and aggravated assault. Farmer argues: (1) the evidence was insufficient to support his conviction of criminal discharge of a firearm at an occupied vehicle and, thus, both that conviction and his felony-murder conviction predicated thereon cannot stand; (2) his convictions for felony murder and criminal discharge of a firearm at an occupied vehicle are multiplicitous; (3) his confession was involuntary; and (4) the district court improperly determined his criminal history score without having it proven to a jury beyond a reasonable doubt.

## FACTS

The events that led to the convictions in this case occurred on July 13, 2002, starting with DeAundrey Neal driving to Farmer's apartment complex in Coffeyville, Kansas, and honking his car's horn. Farmer, who was walking to the northeast between the apartment buildings, returned to the parking area and spoke with Neal through the passenger-side window of Neal's vehicle. A witness saw Farmer walk from the passenger-side window around to the driver's side of Neal's vehicle, pull a gun from his pocket, and put his arm inside the vehicle. The witness then heard several shots. Neal sustained six gunshot wounds: three gunshots to the head, one shot to his neck, one shot in his clavicle, and one shot in his arm. He died at the scene.

After killing Neal, Farmer walked to his apartment, remained inside for a few minutes, then walked out of the apartment complex in a northeasterly direction, the same direction he was headed when Neal had honked his horn at him. Farmer walked about a block to Levi Hayes' house to collect money that Hayes owed him.

Without knocking, Farmer kicked Hayes' front door open and burst into the house. Once inside, Farmer screamed at Hayes, who had been asleep on the couch, then began beating Hayes with the gun he had used to shoot Neal. When Hayes' wife, Betty Hayes, attempted to stop Farmer from beating Hayes, Farmer grabbed

Betty, pointed the gun at her head, and threatened to kill her. While Hayes struggled with Farmer to get the gun, Betty ran next door and called the police.

During the scuffle, Farmer bit Hayes on the neck. Eventually, Hayes took the gun from Farmer. Farmer then left the house. Hayes followed Farmer onto the porch and pointed the gun at Farmer. Hayes was aware the gun was empty because during the struggle Farmer had pulled the trigger and the gun clicked without firing. Hayes then left the gun on the front porch and went back inside the house. Later, ballistics testing of the gun Hayes took from Farmer confirmed that the gun had been used to shoot Neal.

Shortly after the police received Betty's call, they received a separate telephone call that gunshots had been fired. The police believed that the two calls were related because of the close physical proximity of the callers' addresses. The police responded first to the shots-fired call rather than Betty's call.

A witness at the scene of Neal's shooting informed police that he had observed someone wearing khaki pants and a white shirt leaving the apartment complex to the north. Following that information, two officers headed north from the apartment complex and noticed Farmer, who fit the witness' description, walking down the street. The officers observed that Farmer had blood on his clothing.

When Farmer became aware of the officers, he began to take off his clothes. The officers ordered Farmer to stop after he had removed his shirt and was taking off his pants. Farmer then dropped his pants, attempted to run, but tripped himself. When the officers apprehended Farmer, Farmer stated, "Dear Jesus, please forgive me. Please forgive me. I didn't mean to do it." After his arrest but before he was restrained, Farmer kicked one of the officers twice.

Coffeyville police interviewed Farmer immediately after his arrest. After Farmer waived his *Miranda* rights and agreed to speak with the officers, Farmer denied that he had consumed drugs or alcohol, then stated he had no knowledge of Neal being shot. When Farmer was booked into jail, Coffeyville police found in Farmer's pocket a live round of ammunition matching that used to shoot Neal and a bottle of phencyclidine (PCP).

The next morning, Detectives Diane George and Brian Richstatter from the Coffeyville police department interrogated Farmer. Farmer again waived his *Miranda* rights and agreed to speak with the officers. Farmer admitted fighting with Hayes and told the officers that he believed he had been arrested for that fight. Farmer then stated that he was to meet Neal, but the meeting did not occur. He claimed he was not aware that Neal had been shot.

Detective Richstatter asked Farmer if he was a "very religious person." Farmer responded that he was. Detective Richstatter told Farmer to remember that God would forgive him, but Farmer had to be honest. After the detectives had encouraged Farmer to tell the truth, Farmer admitted to the officers that he shot Neal. Farmer stated that the purpose of his arranged meeting with Neal was for Neal to deliver a job application to him. Instead, Neal asked Farmer to sell him some rocks of cocaine. This angered Farmer.

Farmer said he had consumed alcohol and smoked a marijuana joint dipped in PCP prior to the shootings. The detectives obtained samples of Farmer's blood and urine for testing, which showed that Farmer had PCP and marijuana in his urine, but only marijuana in his blood when he had confessed to killing Neal.

The State charged Farmer with first-degree felony murder based on the underlying felony of criminal discharge of a firearm at an occupied vehicle, criminal discharge of a firearm at an occupied vehicle, aggravated burglary for breaking into the Hayes' house, aggravated battery for beating Hayes, and aggravated assault for threatening Betty with a gun.

After a jury convicted Farmer of all charges, the district court sentenced Farmer to life in prison for felony murder, 228 months for criminal discharge of a firearm, 34 months for aggravated burglary, 13 months for aggravated battery, and 13 months for aggravated assault. All five sentences were ordered to run consecutively. Farmer appeals his convictions and his sentences.

## SUFFICIENCY OF THE EVIDENCE SUPPORTING THE CRIMINAL DISCHARGE OF A FIREARM AT AN OCCUPIED VEHICLE CONVICTION

Farmer argues that there is insufficient evidence to support the underlying felony of discharging a firearm at an occupied vehicle

and, thus, he cannot be convicted of either the underlying felony or felony murder.

The State argues that this issue is not properly before the court because Farmer has raised it for the first time on appeal. To support this argument, the State cites the general rule that appellants cannot raise new issues, including constitutional grounds, for the first time on appeal. See *State v. Steadman*, 253 Kan. 297, 306, 855 P.2d 919 (1993). The State, however, cites no authority for the specific proposition that a challenge to the sufficiency of the evidence before the district court is necessary to preserve it for appeal. There is no requirement that a criminal defendant challenge the sufficiency of the evidence before the trial court in order to preserve it for appeal. See K.S.A. 22-3601(b)(1); K.S.A. 2006 Supp. 22-3602. This issue is properly before us.

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Hanson*, 277 Kan. 855, 856-57, 89 P.3d 544 (2004).

Farmer asserts that to convict him of criminal discharge of a firearm at an occupied vehicle, the State had to prove that he maliciously and intentionally, without authorization, discharged a firearm *at* an occupied vehicle. Farmer argues that the evidence showed that he fired at the person in the vehicle, and not at the vehicle and, therefore, the evidence was insufficient to prove criminal discharge of a firearm at an occupied vehicle. Farmer points to the eyewitness testimony that Farmer put his arm inside the vehicle right before he started shooting, plus the fact that four shell casings were found inside the victim's vehicle, and the testimony of a police officer who opined that the gun was inside the vehicle when those four shots were fired in order for the casings to have been in the vehicle.

Farmer contends, and the dissent agrees, the criminal discharge statute focuses on the intended target of the shooting, recognizing a distinction between shooting at a vehicle with someone in it and shooting at an individual in a vehicle. Farmer argues that the intent

of the statute was to cover random acts of shooting violence where no person is targeted or injured. According to Farmer, and the dissent, if the evidence shows the shooter intended to shoot the victim, as it did here, the facts do not fall into the gap the statute was designed to fill. Instead, he argues the act of discharging a firearm at a person who happens to be in the vehicle is aggravated battery or aggravated assault, which merges with felony murder. See K.S.A. 2006 Supp. 21-3436(b)(4), (b)(6). Thus, the argument goes, the State has used the criminal discharge statute in a situation it was not intended to cover.

Farmer also argues that "by [electing] to pursue this shooting as a drive-by shooting charge rather than aggravated battery or aggravated assault," the State was able to avoid application of the merger rule. See K.S.A. 2006 Supp. 21-3436(a)(15) (criminal discharge of a firearm under K.S.A. 21-4219 does not merge with the resulting homicide); *State v. Rayton*, 268 Kan. 711, 724, 1 P.3d 854 (2000) (reaffirming that the crimes of felony murder and criminal discharge of a firearm do not merge). This, he argues, unfairly prejudiced him. For support, Farmer points to the statement in *State v. Taylor*, 25 Kan. App. 2d 407, 422, 965 P.2d 834, *rev. denied* 266 Kan. 1115 (1998), in which the court stated: "Because the drive-by shooting charge is an alternative, rather than an additional charge, the defendant is not prejudiced by the State's election to pursue the drive-by shooting charge."

K.S.A. 2006 Supp. 21-4219(b) was created to impose criminal liability where an individual discharges a firearm into an occupied building or vehicle but the State is unable to prove the requisite intent for the crimes of aggravated assault or aggravated battery. Thus, the statute prohibits "the wanton and willful act [of discharging a firearm into an occupied building or vehicle] itself *without regard to the state of mind of the shooter* . . . ." (Emphasis added.) *Taylor*, 25 Kan. App. 2d at 421 (citing Report of Subcommittee, House Judiciary Committee on Drive-by Shooting [H.B. 2709], February 25, 1992). The statute was designed to cover situations where there are difficulties in proving the shooter's intent. According to Farmer's, and the dissent's, interpretation of the criminal discharge statute, there *cannot be any* evidence of intent

to shoot at anything other than the occupied vehicle or building itself. In other words, there must be a complete absence of intent to hit an occupant of an occupied vehicle or building for the statute to apply. Such a construction eviscerates the criminal discharge statute by putting the focus right back on the shooter's intent, thus making it unavailable in the very situations it was designed to cover—situations where proof of intent to injure or kill is problematic.

Although the dissent contends the State could have charged this crime as first-degree premeditated murder, the issue before us is whether the evidence was sufficient to prove the offense of criminal discharge of a firearm at an occupied vehicle. The fact that the evidence may have supported different charges is irrelevant to this issue.

Therefore, we move to consideration of whether the evidence is sufficient to support the underlying felony of discharging a firearm at an occupied vehicle. K.S.A. 2006 Supp. 21-4219(b) defines criminal discharge of a firearm at an occupied vehicle as:

"the malicious, intentional and unauthorized discharge of a firearm at a dwelling, building, structure, motor vehicle, aircraft, watercraft, train, locomotive, railroad car, caboose, rail-mounted work equipment or rolling stock or other means of conveyance of persons or property in which there is a human being."

To prove the offense of criminal discharge of a firearm at an occupied vehicle, as a severity level 3 person felony under K.S.A. 2006 Supp. 21-4219(b), the State had to establish the following elements beyond a reasonable doubt:

"1. That the defendant maliciously and intentionally, without authorization, discharged a firearm at an occupied vehicle; [and]

"2. That the act resulted in great bodily harm to a person." PIK Crim. 3d 64.02-A-1.

See *State v. Conway*, 284 Kan. 37, 53, 159 P.3d 917 (2007) (approving this instruction as a correct statement of the law).

It is undisputed that Farmer was standing outside of the vehicle shooting a gun. It is undisputed that the vehicle was occupied. It is undisputed that bullets from the gun Farmer was shooting were fired into the occupied vehicle. And it is undisputed that the bullets

caused great bodily harm to the vehicle's occupant. Even if Farmer's hand may have been inside the vehicle when he began shooting, Farmer admitted that he was backing away from the vehicle as he was shooting. His admission is supported by the evidence. Two shell casings were found on the ground outside of the vehicle, located approximately 10 feet in a straight line away from the vehicle's rear axle. Although stippling showed that one of the shots had been fired from less that 1 foot away, the absence of stippling on the other wounds showed those shots were fired from a minimum distance of 1½ to 3 feet or beyond.

Viewing the evidence in the light most favorable to the State, we are convinced that a rational factfinder could have found Farmer guilty beyond a reasonable doubt of the crime of criminal discharge of a firearm at an occupied vehicle. Accordingly, the conviction for felony murder stands. See *State v. Alderson*, 260 Kan. 445, 458, 922 P.2d 435 (1996); *cf. State v. Houck*, 240 Kan. 130, 140, 727 P.2d 460 (1986) (reversing a conviction for felony murder because there was insufficient evidence to support the underlying felony).

## ARE THE CONVICTIONS FOR FELONY MURDER AND CRIMINAL DISCHARGE OF A FIREARM AT AN OCCUPIED VEHICLE MULTIPLICITOUS?

In the alternative, Farmer argues that if he was properly convicted of felony murder based on the underlying felony of criminal discharge of a firearm at an occupied vehicle, then he cannot also be convicted of the underlying felony because the homicide merged with the discharge of the firearm. Farmer claims that a conviction for both crimes is multiplicitous in violation of the constitutional protection against double jeopardy.

The issue of whether the defendant's convictions for criminal discharge of a firearm and felony murder are multiplicitous is a question of law over which this court exercises unlimited review. *State v. Schoonover*, 281 Kan. 453, 462, 133 P.3d 48 (2006).

Farmer argues that the act of discharging the firearm was a single, continuous act of violence, unseparated in time and indistinct

from the resulting death and, thus, the convictions for felony murder and criminal discharge of a firearm are multiplicitous.

We have recently rejected this very argument in *State v. Conway*. In that case, we applied the multiplicity analysis of *Schoonover* and held that the legislature intended felony murder and criminal discharge of a firearm at an occupied to be separate offenses for which there can be cumulative punishments and, thus, double jeopardy violation does not attach to convictions for felony murder and criminal discharge of a firearm at an occupied vehicle even if the charges arise from the same conduct. *Conway*, 284 Kan. at 57. See also *State v. Walker*, 283 Kan. 587, Syl. ¶ 23, 153 P.3d 1257 (2007) (double jeopardy does not attach to convictions for felony murder and discharge of a firearm at an occupied dwelling, even if the charges arise from the same conduct).

Accordingly, Farmer's convictions of felony murder and criminal discharge of a firearm at an occupied vehicle are separate offenses for which cumulative punishments may be imposed.

## WAS FARMER'S CONFESSION VOLUNTARY?

Detectives George and Richstatter interrogated Farmer for approximately an hour and a half the morning after he was arrested. The detectives did not handcuff or shackle Farmer in the interview room. The interrogation was recorded on both videotape and audiotape. The detectives took a 15-minute break during the interrogation and provided Farmer with coffee, water, and blankets upon his request.

Farmer was advised of his *Miranda* rights and waived them prior to speaking with the detectives. Farmer did not ask for an attorney or request an opportunity to speak with anyone else. Although Farmer spoke softly, he did not appear to be confused or under the influence of drugs or alcohol during the interview. When Farmer advised the detectives that he drank some alcohol and smoked a marijuana cigarette dipped in PCP the night before, the detectives requested samples of Farmer's blood and urine to test. The results indicated that Farmer had PCP and marijuana in his urine but only marijuana in his blood. There is no evidence that Farmer's decision process was impaired.

Initially, Farmer admitted to having a fight with Hayes but denied any knowledge of shooting Neal. A few minutes later, Farmer admitted seeing Neal drive into the parking lot and talking to him. Farmer asked the officers, "Did I shoot him?" One of the detectives responded, "Do you think you shot him?" After the detectives encouraged Farmer to do the right thing and tell the truth, Farmer admitted to the detectives that he shot Neal. He also disclosed inculpatory information about the fight with Hayes, admitting that he hit him with his gun. Farmer argues that the detectives coerced the confession from him by telling him that God would forgive him if he confessed.

Farmer claims that the district court should have suppressed his involuntary confession. He argues that the police used unfair interrogation tactics when they appealed to his religious beliefs to obtain a confession. Specifically, Farmer takes issue with the following statements:

"Whatever you did, whatever happened, okay, the most important thing to remember is that God can forgive everything, but . . . . To do that, you have to be honest."

"God wants you to tell the truth, Darrell. That's the most important thing. God wants you to be honest and help yourself."

"It sounds kinda corny, kinda clich, but the truth will set you free."

An appellate court reviews the admission of a confession using a dual standard of review. First, the court reviews the factual findings using a substantial competent evidence standard. Giving deference to the trial court's factual findings, an appellate court does not reweigh the evidence or pass on the credibility of witnesses. Second, the court analyzes the ultimate legal conclusion drawn from the trial court's factual findings using an unlimited standard of review. *State v. Harris*, 279 Kan. 163, 167, 105 P.3d 1258 (2005).

Coercion can be mental or physical. Therefore, analyzing whether a defendant's confession is voluntary requires the appellate court to evaluate the totality of the circumstances as outlined by the following six factors:

"(1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the

officers in conducting the interrogation; and (6) the accused's fluency with the English language." *State v. Walker*, 283 Kan. 587, 596-97, 153 P.3d 1257 (2007).

Farmer does not raise any issues regarding the duration or manner of the interrogation; his ability to communicate with the outside world; his fluency; or his age, intellect, or background. Farmer's argument concerns the fairness of the officers' interrogation. On that issue, the district court specifically found that "Richstatter asked Farmer some questions. Richstatter, however, was unaware of any religious beliefs that Farmer held. Richstatter did not know if Farmer attended church, or regularly read the Bible." This factual finding is supported by substantial competent evidence in the record. Farmer, however, focuses his argument on Detective Richstatter's comments as to Farmer's religious beliefs, claiming that the comments were unfairly coercive because they caused him to consider a higher will instead of focusing on his own interests.

We note that the Court of Appeals addressed a similar issue in *State v. Cobb*, 30 Kan. App. 2d 544, 43 P.3d 855, *rev. denied* 274 Kan. 1115 (2002). During a homicide interrogation, a police officer made numerous religious references, asking the defendant, Artis Cobb, if the Lord would prefer truth or lies and if Cobb thought that God would be pleased with what Cobb was saying. Cobb then initiated the discussion of religious themes during the interrogation, stating that God would see him through the situation. Cobb argued that his confession was coerced by the officer's improper appeals to his religious beliefs. Although it considered the case to be a close one, the *Cobb* court upheld the admission of Cobb's confession. The court relied on Cobb's enthusiastic participation in the religious discussion and suggested that "persons of deep religious faith should [not] be presumed to be more gullible and easily manipulated than those with deeply held secular beliefs or opinions." 30 Kan. App. 2d at 559. In reaching its conclusion, the *Cobb* court analogized the officer's use of religious comments to the technique of feigning agreement with and enthusiasm for the defendant's worldview. 30 Kan. App. 2d at 559.

Farmer questions the *Cobb* court's statement about the gullibility of religious persons, claiming that the *Cobb* court had mis-

focused on the gullibility of the person under interrogation where it should have focused on the propriety of the officer's interrogation technique. This argument overlooks the *Cobb* court's analogy to the interrogation technique of feigning agreement with the defendant's worldview. The *Cobb* court's holding does not rely on gullibility, rather it refuses to suggest that religious people are more susceptible to coercion when interrogators feign agreement with the defendant's worldview.

Farmer does not argue that Detective Richstatter's comments in this case are more egregious than those in *Cobb*. Although the statements in this case are similar in nature to the statements in *Cobb*, the religious comments were more pervasive in *Cobb*. Thus, *Cobb* supports the district court's conclusion that Farmer's confession was not coerced by the officers' references to Farmer's religious beliefs. Farmer's attempt to distinguish *Cobb* based on the court's comments as to Farmer's gullibility is without merit.

Farmer also relies on *People v. Montano*, 226 Cal. App. 3d 914, 277 Cal. Rptr. 327 (1991); *People v. Adams*, 143 Cal. App. 3d 970, 192 Cal. Rptr. 290 (1983), *disappoved on other grounds People v. Hill*, 3 Cal. 4th 959, 13 Cal. Rptr. 2d 475, 839 P.2d 984 (1992); and *Carley v. State*, 739 So. 2d 1046 (Miss. App. 1999), for the proposition that any reference to the defendant's religious beliefs is coercive. We note that none of these cases stand for the broad proposition suggested by Farmer and are factually distinguishable from this case.

*Montano* involved a confession by an 18-year-old illegal Mexican immigrant who was questioned using a police officer as an interpreter. Although the defendant repeatedly told the police officers that he did not want to talk to them, the police officers did not respect the defendant's right to silence and continued to ask him questions. The *Montano* court noted that the officers aggravated the situation by using a common religion to "conjure up in defendant's mind the picture of confessing to avoid going to hell," but held the defendant's confession involuntary based on the officers' failure to respect the defendant's repeated attempts to invoke his right to silence. 226 Cal. App. 3d at 935-37.

The *Adams* case involved a 32-year-old defendant who was acquainted with the sheriff who interrogated her. The sheriff, who knew the defendant through her participation in his church and her employment in a Christian book store, quoted the Bible and told the defendant that God would turn his back on any person who refused to submit to God and that people who stopped living according to God's law were required to suffer some form of discipline. The sheriff further stated to the defendant that she was a candidate for a nervous breakdown because she was not telling the truth.

The *Adams* court concluded that the sheriff's remarks were not purely intellectual persuasion but "an overwhelming and calculated appeal to the emotions and beliefs, focusing appellant's fears in an area the sheriff knew appellant to be particularly vulnerable." 143 Cal. App. 3d at 986. The *Adams* court's analysis relied on the sheriff's exploitation of his friendship with the defendant and the sheriff's use of her known vulnerabilities and fears. 143 Cal. App. 3d at 989. A dissenting judge disagreed with the majority's analysis, noting there was evidence that showed the defendant to be devious and scheming, which refuted the theory that she was a helpless, easily pressured victim of sophisticated police interrogation. 143 Cal. App. 3d at 1003-05.

*Carley* involved a confession by a mentally ill 14-year-old boy with learning disabilities who had not taken his anti-psychotic medications for 4 days. The *Carley* court reversed the boy's conviction for murder, holding that his confession was "induced by the investigating officers' invocation of the deity, references to Heaven and Hell, and promises of leniency and religious salvation." 739 So. 2d at 1054.

The only commonality between this case and *Montano, Adams*, or *Carley* is the reference to religion. Here, there are no other aggravating factors found in *Montano, Adams*, or *Carley*. We note that Farmer is not a mentally ill juvenile and does not have problems understanding the English language. Farmer did not attempt to invoke his right to silence. The interrogating officers did not have previous relationships with Farmer, so they could not have exploited that relationship or known of Farmer's religious back-

ground or his vulnerabilities and fears. The *Montano*, *Adams*, and *Carley* cases are not helpful in analyzing this issue.

Prior Kansas case law does not restrict police officers from encouraging people to tell the truth during interrogations. In *State v. Kornstett*, 62 Kan. 221, 227, 61 Pac. 805 (1900), the police told the defendant that he would feel better if he told the truth. The *Kornstett* court concluded that "mere advice or admonition to the defendant to speak the truth, which does not import either a threat or benefit, will not make a following confession incompetent." 62 Kan. at 227. Here, interrogating detectives repeatedly encouraged Farmer to tell the truth but did not threaten him if he would not. *Cf. State v. Elnicki*, 279 Kan. 47, 105 P.3d 1222 (2005).

Likewise, the detectives made no promise of leniency for Farmer's honesty. Although Detective Richstatter's comments "be honest and help yourself" and "the truth will set you free" may imply a benefit, when viewed in the totality of the circumstances, the comments do not indicate any promises in return for Farmer's confession. When Farmer asked what would happen to him, Detective George informed him the case was still under investigation, then reminded Farmer that he was in jail and that he would be charged. Detective George told Farmer that she would talk to the county attorney and attempt to find out what the charges would be but did not indicate that she would try to influence what the county attorney charged. Farmer informed the detectives that his statements to them did not result from force or their promises.

When viewed in the totality of the circumstances, Farmer has failed to establish how the detectives' conduct during the interrogation unfairly deprived him of his free and independent will. We conclude that the trial court correctly determined that Farmer's confession was voluntary and properly admitted it at his trial.

## MUST A DEFENDANT'S CRIMINAL HISTORY SCORE BE PROVEN TO A JURY BEYOND A REASONABLE DOUBT PRIOR TO SENTENCING?

Finally, Farmer asserts that his sentence is illegal because the trial court used his criminal history score, which had not been proved beyond a reasonable doubt to a jury. The court uses a de

novo standard to review the legality of Farmer's sentence under the sentencing guidelines. See *State v. Ivory*, 273 Kan. 44, 46, 41 P.3d 781 (2002).

We note that this issue has been previously decided in *Ivory*, where this court held that the defendant's criminal history score does not have to be found beyond a reasonable doubt by a jury to satisfy *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). Farmer argues that *Ivory* should be over-ruled and, for support, quotes language from *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004). We have reaffirmed *Ivory* after the United States Supreme Court's post-*Apprendi* decision in *Blakely*, as well as the decisions in *United States v. Booker*, 543 U.S. 220, 160 L. Ed. 2d 621, 125 S. Ct. 738 (2005), and *Shepard v. United States*, 544 U.S. 13, 161 L. Ed. 2d 205, 125 S. Ct. 1254 (2005). *State v. Gonzalez*, 282 Kan. 73, 145 P.3d 18 (2006); *State v. Lackey*, 280 Kan. 190, 120 P.3d 332 (2005). Moreover, we note that in 2007, the United States Supreme Court reaffirmed that the fact of a prior conviction does not have to be found by a jury. See *James v. United States*, 550 U.S. 192, 214 n.8, 167 L. Ed. 2d 532, 127 S. Ct. 1586 (2007).

Farmer's claim that his sentence improperly relies on his criminal history score in violation of *Apprendi* is without merit.

Affirmed.

DAVIS, J., not participating.

GREENE, J., assigned.

BEIER, J., concurring in part and dissenting in part: I agree with the majority that, in theory, convictions for felony murder and discharge of a firearm at an occupied vehicle are not multiplicitous. I also agree that defendant Darrell L. Farmer's confession was

voluntary, and that the district judge properly determined his criminal history score.

I disagree with the majority's analysis and result on Farmer's sufficiency claim. It is painfully obvious that the State pursued a first-degree felony-murder theory that the undisputed facts of this case could not support—"obvious" because there is zero evidence that Farmer shot *at* the vehicle in which DeAundrey Neal happened to be sitting rather than *at* Neal himself; "painfully" because the prosecution's mistake requires reversal of both the firearm conviction and the necessarily dependent felony-murder conviction, despite ample evidence that Farmer killed Neal in cold blood.

I understand—and rue—the bitterness of this pill. Nevertheless, I am persuaded that the statute compels us to swallow it.

The crime at issue requires "discharge of a firearm at an occupied . . . motor vehicle." K.S.A. 2006 Supp. 21-4219(b). The phrase, "at [a] . . . motor vehicle," does not look or sound ambiguous to me. Shooting at a motor vehicle is one thing; shooting at a person is something else. Regardless of whether the State's or the defendant's version of events is relied upon here, Farmer shot only at Neal. Evidence of where Farmer may have been standing when he fired, of where Neal may have been sitting when he was hit, or of where two shell casings may have fallen after being ejected from Farmer's weapon, is interesting but not determinative.

Even assuming that "at [a] . . . motor vehicle," as used in the statute, is ambiguous, I still cannot reach the majority's result. The available legislative history, as our Court of Appeals has previously recognized in cases involving discharge of a firearm at an occupied dwelling, demonstrates that the crime defined by K.S.A. 21-4219(b) was intended to cover malicious and willful acts of shooting into occupied spaces that did not fit under other felony statutes. See *State v. Taylor*, 25 Kan. App. 2d 407, 419-20, 965 P.2d 834 (1998); *State v. Caldwell*, 21 Kan. App. 2d 466, 468, 901 P.2d 35, *rev. denied* 258 Kan. 860 (1995). The new crime was designed to address

"the situation when aggravated assault and aggravated battery fail[] to cover the act. Malicious and willful shooting at an occupied building or vehicle, but where

the individual is not placed in immediate apprehension of bodily harm, is a class D felony. This is the same class of felony as aggravated assault and will cover the situation where aggravated assault would fail. The willful and malicious shooting at an occupied building or vehicle which results in bodily injury is a class C felony. This is the same class felony as aggravated battery and will cover those situations where the requisite intent to injure, required for battery, cannot be shown." Report of Subcommittee, House Judiciary Committee on Drive-by Shooting (H.B. 2709), February 25, 1992.

As the Court of Appeals wrote,

"[t]he [legislative] subcommittee's objective was to fill the gaps in the law prohibiting the full prosecution of drive-by shootings. . . .

"In a situation where the defendant announced his presence and intent to [do] harm to the occupants of the building prior to discharging gunfire into the building, and all those within the building heard and appreciated the danger, full prosecution of the crime was possible by charging aggravated assault as to each occupant who was not injured and aggravated battery as to each occupant who was injured in the gunfire. Where, however, the defendant discharged a firearm into an occupied building but no occupant was aware of the threat prior to the gunfire, no one was injured, and the property damage was negligible, the law as it existed prior to the enactment of the drive-by shooting statute limited the State to charging misdemeanor criminal damage to property, which was clearly insufficient as a punishment or as a deterrent. The drive-by shooting statute filled this gap in the law by establishing a felony statute prohibiting the wanton and willful act itself without regard to the state of mind of the shooter, the victims, or the amount of property damage." *Taylor*, 25 Kan. App. 2d at 420-21.

In other words, the statute had a specific purpose. It was not intended to capture and cannot capture conduct punishable as a felony because it already fit the definition of aggravated assault or aggravated battery.

Here, again, Farmer shot only *at* Neal. This dictated particular legally viable charging options for the State. It could have pursued Farmer's conviction on first-degree felony murder based on aggravated battery, either because Neal was killed during the commission of Farmer's act of intentionally causing great bodily harm under K.S.A. 21-3414(a)(1)(A) or because Neal was killed during the commission of Farmer's act of intentionally causing bodily harm with a deadly weapon under K.S.A. 21-3414(a)(1)(B). Additionally or alternatively, it could have pursued Farmer's conviction on first-degree premeditated murder.

Instead, the State chose none of the above—perhaps in part to avoid application of the merger doctrine to felony murder and aggravated battery, perhaps in part to avoid the higher evidentiary burden of proving premeditation by a PCP-using defendant. It matters not. This court should not be in the business of correcting for the State's charging choice, whether it grew out of strategic miscalculation or mere mistake. Ample precedent from this court and our Court of Appeals supports the limited role of an appellate court in such a situation. See *State v. Dickson*, 275 Kan. 683, 693-95, 69 P.3d 549 (2003) (conviction reversed without remand for new trial where evidence proved violation of subsection of statute different from one charged); *State v. Schad*, 247 Kan. 242, 244-47, 795 P.2d 406 (1990) (conviction reversed without remand, where evidence could have supported other charges but was insufficient to establish crime charged); *State v. Houck*, 240 Kan. 130, 135-36, 727 P.2d 460 (1986) (conviction reversed without remand, where evidence did not support conviction of offense charged; "accused cannot be found guilty of some other offense which State did not see fit to charge"); *State v. Stewart*, 31 Kan. App. 2d 357, 65 P.3d 555 (2003) (conviction reversed without remand; where evidence insufficient; defendant's unlawful actions did not conform to crime charged); *State v. Robinson*, 27 Kan. App. 2d 724, 8 P.3d 51 (2000) (conviction reversed without remand on sufficiency claim; prosecution proved one theory of crime but instructed jury on other theory).

Given all of the above, I would reverse Farmer's convictions on criminal discharge of a firearm into an occupied motor vehicle and on felony murder.

JOHNSON, J., joins in the foregoing concurring and dissenting opinion.