NOT DESIGNATED FOR PUBLICATION

No. 128,234

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ALEESA MARIE LENNON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; NEIL B. FOTH, judge. Submitted without oral argument. Opinion filed April 10, 2026. Affirmed.

*William C. Votypka*, of Law Office of William C. Votypka, of Olathe, for appellant.

*Maria C. Davies*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before BOLTON FLEMING, P.J., ISHERWOOD and COBLE, JJ.

PER CURIAM: Following a bench trial, the Johnson County District Court convicted Aleesa Marie Lennon of one count of a violation of a protective order. The district court sentenced Lennon to 60 days in jail, suspended for 12 months of probation. Lennon appeals, claiming insufficient evidence supported her conviction. On review, we find the evidence sufficient and affirm her conviction.

1

FACTUAL AND PROCEDURAL BACKGROUND

On September 11, 2023, the State charged Aleesa Marie Lennon with one count of violation of a protection order for knowingly violating a protection from stalking order. The case proceeded to a bench trial in Johnson County District Court.

At trial, the State sought admission of State's Exhibit 1, which was a certified copy of the Final Order of Protection from Stalking, Sexual Assault, or Human Trafficking issued in Johnson County District Court case No. 23CV3998. The State noted that it would "[n]ormally" ask the court to take judicial notice of the document but did not explain why it sought to admit it as an exhibit instead. The court admitted the exhibit without objection.

The State called J.L., who testified about the events of September 10, 2023. J.L. testified that he returned to his home in Overland Park and had dinner with his family. He had a Ring doorbell, which captured video of his front door area. He said Lennon came to his door and rang his doorbell that evening, and positively identified Lennon in the courtroom.

The State moved to admit a video recording from J.L.'s Ring doorbell, which was timestamped as September 10, 2023, 7:41 p.m. The district court admitted the video as State's Exhibit 2 without objection. The State published the 43-second video clip. J.L. testified that the video showed Lennon at the front door of his home. He said that after the video recording stopped, he walked outside and told Lennon she was not supposed to be there and that she was in violation of the protection order he had filed the month prior. J.L. testified they "had it in court here, so she knew that I had a protection order on her." He said he "applied for a protection order for stalking back awhile prior to that, but it was granted on August 10th." J.L. said Lennon kept "screaming and screaming and screaming" while on his doorstep and he told her he was going to go inside and call the

2

police. When he got inside, he realized his wife had already called the police as soon as Lennon arrived at their home.

The State showed J.L. the protection order, and he confirmed it was the one he was referring to during his testimony. He said that it protected him from any contact from Lennon, including contact at his residence.

The State's second witness was Overland Park Police Officer Ian Yang. Officer Yang testified that he responded to a call at J.L.'s address on September 10, 2023. Officer Yang said he spoke to J.L., but Lennon had apparently left the scene before the officer arrived. Officer Yang said J.L. showed him the same video footage in State's Exhibit 2. As an additional part of his investigation, Officer Yang confirmed that the protection from stalking order was still active when the incident occurred.

At the close of the State's evidence, Lennon moved for a directed verdict based on a lack of evidence demonstrating she knowingly violated the protection from stalking order. Her counsel argued there was no evidence nor sufficient evidence presented showing that Lennon knew about or was served with the order. Counsel asserted that the certificate of service on the order of protection merely said the order was "served by email" and that such evidence was insufficient pursuant to Kansas statutes and Supreme Court rules.

After some discussion, the district judge denied Lennon's request for directed verdict, stating:

> "[O]rders that judges make from the bench in the presence of the defendant are effective orders. . . .
> . . . .

"This judge made findings, granted the final orders of protection. Defendant, I'm going to assume, knew what it was all about. This State's exhibit also shows that she was personally served with the temporary orders of protection to which the final order is essentially just an extension of for a year.

"So she was there when the judge made the findings. She was there when the judge issued the order of protection. Her possession of this piece of paper does not mean that she was not—whether or not she was—had this piece of paper served on her that day or some later date does not invalidate the order or create the fact that she hasn't been served, does not mean that she can't violate it if she was present when a judge issued those orders from the bench."

Lennon presented no evidence. In closing, defense counsel requested Lennon be acquitted, arguing the State failed to carry its burden to demonstrate that she knowingly violated a protection order based on the evidence at trial.

The district judge found:

"[B]eyond a reasonable doubt that the final order of protection was in effect on September 10, 2023. That defendant had personal contact with the protected person, [J.L.], on September 10, 2023, in Overland Park. That at that time, defendant was under a final order of protection as per State's 1, that being the journal entry of final order of protection. That that document makes findings that defendant had been served with temporary orders of protection, which must be served personally, and this says the defendant was personally served with the temporary orders that she was under until the date of trial.

"Trial was had. . . . Court held a trial on the petition for protection from stalking, made findings that plaintiff had sustained his burden in proving the stalking and was entitled to final orders, and on that day, issued final orders.

"And I would note also that Judge Foster signed the journal entry on the day of the trial that I don't have any doubt that copy of this order was served on her at the time of the trial as per his practice and. . . . Well, as is the practice of any family court judge doing PFA or PFS trials, the journal entry is filled out, signed, and served if the defendant is present. Defendant here was present. Therefore, I don't have any reasonable doubt that

4

she was not served with final order in court. It's conceivable that she wasn't, but that's what I take this exhibit to show, that it's a final order that was signed by the judge, the findings made by the judge, and the order signed by the judge all in court where the judge signed the order presumably from the bench on the date of this trial."

The district judge concluded:

"So I think State's proven beyond a reasonable doubt that defendant was given the orders and served the orders as is the standard practice at the conclusion of every PFS trial I've seen.

"Therefore, defendant is in violation of this protection order—or did violate this protection order back on September 10 of last year. Defendant is, therefore, guilty of that crime."

On July 25, 2024, the district court sentenced Lennon to 60 days in jail and granted her request for suspended imposition of that sentence for a 12-month period of probation. Lennon appeals.

## ANALYSIS

Lennon argues the State failed to prove beyond a reasonable doubt that she knowingly violated the protective order. She maintains that her conviction was based not on evidence but based on assumption or presumptions by the district court.

"The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires proof beyond a reasonable doubt of every element of the crime charged. It also requires fact-finders to rationally apply the proof-beyond-a-reasonable-doubt standard to the facts in evidence." *State v. Sieg*, 315 Kan. 526, 530, 509 P.3d 535 (2022). So, when a criminal defendant challenges the sufficiency of the evidence, the appellate court reviews the evidence in the light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable

doubt. 315 Kan. at 529; see also *State v. Mendez*, 319 Kan. 718, 723, 559 P.3d 792 (2024). The appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. 319 Kan. at 723. Additionally, the court's review is unlimited as to questions of statutory interpretation. *State v. Daniels*, 319 Kan. 340, 342, 554 P.3d 629 (2024).

Lennon's claim is properly preserved for appeal. "There is no requirement that a criminal defendant challenge the sufficiency of the evidence before the trial court in order to preserve it for appeal." *State v. Farmer*, 285 Kan. 541, 545, 175 P.3d 221 (2008).

The State charged Lennon with one count of violating a protection from stalking order under K.S.A. 21-5924, which required the State to prove that Lennon "knowingly violat[ed]. . . a protection from stalking" order. K.S.A. 21-5924(a)(6). As before the district court, Lennon now argues there was insufficient evidence of any such order of protection and insufficient evidence that she was served with that order. Lennon asserts that the only evidence regarding a possible protective order in place against her at the time of the alleged crime was State's Exhibit 1. Because the district court did not take judicial notice of the entirety of the case file in the protection from stalking case No. 23CV3998, she suggests that the State did not present evidence of any ex parte order of protection from stalking. Thus, she argues, she could not be convicted of knowingly violating a protection from stalking order as required by K.S.A. 21-5924(a)(6).

State's Exhibit 1 is a certified copy of the final order of protection from stalking, signed by the judge and dated August 10, 2023. It provides case No. 23CV03998; the names of the plaintiff, J.L., and the defendant, Lennon; and lists J.L. as the "Protected Person." Checkboxes on the order indicate that J.L. and Lennon were personally present at the hearing during which the final order of protection was entered. The order includes the following findings by the issuing court:

"Plaintiff filed a written verified petition on JULY 24, 2023, requesting an Order of Protection from Stalking, Sexual Assault, or Human Trafficking. Prior to this hearing, Defendant was given reasonable notice of the date set for the hearing, together with a copy of the petition and any ex parte order of protection from stalking, sexual assault, or human trafficking, by personal service on JULY 30, 2023."

"This Court has jurisdiction over Plaintiff, Defendant and subject matter."

"The matter was heard and submitted to the court which finds

. . . .

". . . that the allegations of stalking, sexual assault, or human trafficking are proven by a preponderance of the evidence as required by K.S.A. 60-31a05."

The document provides additional orders, including that "[d]efendant shall not enter or come on or around the premises, the residence, the property, school, or place of employment of the Protected Person(s) or other family or household member." At the end of the document, the "Praecipe/Request For Service" section states that the defendant was served the final order by email. Based on the information on the order, it was filed on August 10, 2023, and would have been in effect on September 10, 2023, when Lennon rang the doorbell of the protected person.

K.S.A. 21-5924 does not require that a defendant be personally served with a protective order. The statute only requires the State to prove a defendant "knowingly violat[ed]" the order. The Kansas stalking statute provides more detail on the notice issue, defining a prerequisite of stalking as "after being served with, or otherwise provided notice of, any protective order included in K.S.A. 21-3843, prior to its repeal or K.S.A. 21-5924, and amendments thereto, that prohibits contact with a targeted person . . . ." K.S.A. 21-5427(a)(3). The stalking statute further explains:

"(c) For the purposes of this section, a person served with a protective order . . . or a person who engaged in acts which would constitute stalking, after having been

advised by a law enforcement officer, that such person's actions were in violation of this section, shall be presumed to have acted knowingly as to any like future act . . . ." K.S.A. 21-5427(c).

This subsection appears to provide a presumption not only as to the culpability element of stalking, but to culpability in repeated violation of a protective order. At minimum, it demonstrates that the law recognizes forms of notice beyond formal service, including advisement by law enforcement officers.

Of course, if the order contained a statement that Lennon *had* been personally served with the protective order, the knowledge requirement would be easily satisfied. K.S.A. 21-5924(a). A recent decision from our court addressed the sufficiency of notice in a protective order case where the State had presented a return of service showing personal service. *State v. Colwell*, 66 Kan. App. 2d 30, 40, 577 P.3d 591 (2025). In *Colwell*, our court found that a return of service form showed the defendant was "personally served with a copy of the petition, summons, notice of hearing, and temporary protective order" and that a rational fact-finder viewing the evidence in the light most favorable to the State could have found the defendant knowingly violated that temporary protective order for his subsequent conduct. 66 Kan. App. 2d 32, 40. While this case emphasizes the importance of establishing notice for protective order violations, it does not preclude other forms of notice outside of personal service.

Here, even if the final order of protection was the only evidence before the court at trial, that final order indicates that Lennon was served by email, that she was present at the hearing on the final order, and that she had been personally served with the petition and any ex parte order of protection by personal service. This evidence, taken together, sufficiently supports the district court's finding beyond a reasonable doubt that Lennon not only violated the protective order, but she did so knowing that the final protective order was in place.

8

In *State v. Cantu*, our court reversed a defendant's violation of a protection order conviction for insufficient evidence. 63 Kan. App. 2d 276, 282-83, 528 P.3d 265 (2023), *rev'd on other grounds* 318 Kan. 759, 547 P.3d 477 (2024). The court considered an argument concerning notice of an order of protection from stalking, finding that without evidence showing the defendant was served or provided notice of a temporary order or the final order, he could not be convicted of "knowingly" violating a protection from stalking order. 63 Kan. App. 2d at 283. The State had claimed that because the final order showed Cantu was given a copy of the petition requesting the order of protection and "'any'" ex parte order, Cantu necessarily knew that a protection order was in place. 63 Kan. App. 2d at 282. The court found, however, that there was no evidence that an ex parte order was ever put in place and that the district court was not required to enter ex parte orders upon the filing of the petition. 63 Kan. App. 2d at 282. The court held: "Because Cantu was not present at the hearing when the final order was put in place and because there is no evidence that a temporary order was granted, a jury could not find that Cantu knowingly violated a protection from stalking order." 63 Kan. App. 2d at 283.

A significant distinction between *Cantu* and the present case is that the final order filed against Lennon indicates that she was present at the hearing on the final order. Lennon argues, however, that even if she was present for the hearing and the district court stated he was entering a final order of protection from stalking, there is no proof she was on notice of the provisions of the final order absent proof of service by the State. And one might reason that even if Lennon was present at the hearing, there is a lack of evidence that Lennon was present "when the final order was put in place," because the district court could have issued the order after the hearing was over. See *Cantu*, 63 Kan. App. 2d at 283. But at the criminal trial, the district judge noted that the issuing court signed the final order on the same date as the hearing was held, and it found that Lennon must have been served with the order in court:

"Well, as is the practice of any family court judge doing PFA or PFS trials, the journal entry is filled out, signed, and served if the defendant is present. Defendant here was present. Therefore, I don't have any reasonable doubt that she was not served with final order in court. It's conceivable that she wasn't, but that's what I take this exhibit to show, that it's a final order that was signed by the judge, the findings made by the judge, and the order signed by the judge all in court where the judge signed the order presumably from the bench on the date of this trial."

Although the State is required to show sufficient evidence supporting each element of the crime—including a culpable mental state—that evidence may be circumstantial. See *State v. Hilyard*, 316 Kan. 326, 331, 515 P.3d 267 (2022). In *Hilyard*, for example, the Kansas Supreme Court found that premeditation may be shown by circumstantial evidence, provided the inferences drawn are reasonable. 316 Kan. at 331. Moreover, "[s]ufficient evidence, even circumstantial, need not rise to such a degree of certainty that it excludes any and every other reasonable conclusion." 316 Kan. 326, Syl. ¶ 2. Here, the district court's inference that Lennon was served with the final order at the hearing was reasonable.

The law requires that we review the evidence in the light most favorable to the State and determine whether a rational fact-finder could have found Lennon guilty beyond a reasonable doubt. *Sieg*, 315 Kan. at 530. Because the final order of protection clearly states that Lennon was present at the hearing on the final order and that she was served the final order by email, we find the evidence sufficient to uphold her conviction.

Affirmed.